[No. D033527. Fourth Dist., Div. One. May 9, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID A. ENGLEBRECHT, JR., Defendant and Appellant.

COUNSEL

ACLU Foundation of San Diego & Imperial Counties, Jordan C. Budd; Sullivan, Hill, Lewin, Rez & Engel and Candace M. Carroll for Defendant and Appellant.

Paul J. Pfingst, District Attorney, Susan K. Mazza and Terri A. Perez, Deputy District Attorneys, for Plaintiff and Respondent.

OPINION

BENKE, J.—In this case the trial court enjoined 28 named members, including David A. Englebrecht, Jr., and all other members of the Posole street gang from engaging in various activities, e.g., possessing weapons, associating with other gang members, within a designated area of the City of Oceanside. Englebrecht appeals, arguing the trial court erred in denying him a trial by jury on the issue of his gang membership, in deciding the case on a preponderance of evidence rather than a clear and convincing standard of proof and in using an incorrect definition of active gang membership. In addition, he contends the injunction is more burdensome than necessary and that it infringes on his right of free association. Finally, he argues that particular provisions of the injunction are unconstitutional.[1]

BACKGROUND

In November 1997, the District Attorney of San Diego County sought a permanent injunction to abate a public nuisance. The complaint alleged that members of the Posole street gang were engaged in illegal, terrorizing and harassing behavior in a defined one-square mile "target area" in the "Eastside" section of the City of Oceanside.

After a bench trial the court found, based on a preponderance of the evidence standard of proof, that Posole was a criminal street gang that claimed the target area as its territory. The court found that within that area its members engaged in acts of violence, intimidation, destruction of property and public disruption and that these activities amounted to a public

---

[1]The People note Englebrecht, the only party who contested issuance of the injunction, has been released by the trial court from its effect. They argue the case should be dismissed since we can grant appellant no effective relief. (See *Eye Dog Foundation v. State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541 [63 Cal.Rptr. 21, 432 P.2d 717].) However, since the legal issues here are of broad public interest and are likely to recur, we decline to dismiss the case. (See *Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1202, fn. 8 [31 Cal.Rptr.2d 776, 875 P.2d 1279]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, §§ 642, 652-653, pp. 669-670, 682-689.)

nuisance. The court found the target area sufficiently defined geographically and restricted to an area minimally necessary to protect the Eastside community. The court found a nexus between the gang members' described activities and the acts to be enjoined. The court also found that Englebrecht was an active member of the Posole gang.

Members of the Posole gang were enjoined from engaging in various stated criminal and crime-related activities in the target area. Specifically, provision "s" of the injunction enjoined gang members from "Using words, phrases, physical gestures, or symbols commonly known as hand signs which describe or refer to the gang known as Posole . . . ." The provision specifically described those signs and gestures. Provision "t" enjoined the members from "Wearing clothing which bears the name or letters that spell out the name of the gang known as Posole or associated with the gang known as Posole, such as, but not limited to, any variations or combinations of: 'Posole'; 'Posoles'; 'P'; 'PT'; 'M'; "Eme'; 'Varrio Posole'; 'Varrio Posole Locos'; 'Varrio Posole Loco'; 'Posole Town'; 'VP'; 'VPL'; 'VPLS'; '13'; '20'; '13 20'; '16'; '16 20'; '22'; '22 16'; '22 16 12'; '22 16 12'; '22 16 12 19.' "[2]

[2]The injunction enjoined the named defendants, the Posole gang, "its members, agents, servants, and employees, and all persons acting under, in concert with, or from any of them" from the following conduct in the target area:

"a. Standing, sitting, walking, driving, bicycling, or gathering anywhere in public view with any other defendant herein, or with any other known Posole gang member. This prohibition shall not apply to named defendants living in the target area on November 25, 1997, who are father and sons/daughters, mothers/sons/daughters;

"b. Drinking alcoholic beverages, being under the influence of or using drugs in public;

"c. Possessing any weapons: knives; clubs; concealed or loaded firearms; baseball bats; glass bottles; or any other instrument prohibited by Penal Code Section 12020;

"d. Engaging in fighting in the public streets, alleys, and/or public and private property;

"e. Using or possessing marker pens, spray paint cans, knives, screwdrivers, razor blades, or nails for the purpose of applying graffiti or vandalizing property;

"f. Spray painting or otherwise applying graffiti on any public or private property, including but not limited to: the street; alley; residences; block walls; vehicles; and/or, any other real or personal property;

"g. Trespassing on any private property;

"h. Placing bicycles, or motorized vehicles in a manner to obstruct the free passage of any person or vehicle on: any street; walkingway; sidewalk; driveway; alleyway; or, other area of public passage;

"i. Approaching vehicles, or otherwise communicating with the occupants of any vehicle, for the purpose of obstructing or delaying the free flow of vehicular traffic as described in V.C. § 22500;

"j. Discharging any firearms;

"k. In any manner confronting, intimidating, annoying, harassing, threatening, challenging, provoking, assaulting and/or battering any residents or patrons or visitors to the Target Area or any persons who are known to have complained about gang activities;

"l. Participating in the use, possession and/or sale of narcotics;

## DISCUSSION

### A. *Jury Trial*

 Englebrecht contends the trial court erred in denying his request for a jury trial on the issue of whether he was an active member of the Posole gang. He makes two arguments: first, he asserts that while the People sought an equitable remedy to which no right of jury trial applies, his defense of nonmembership in the Posole gang raised legal issues which should, under the California Constitution, have been decided by a jury; second, he argues that under the due process clauses of both the California and federal Constitutions he was entitled to a jury trial since the granting of the injunction involved a serious curtailment of liberty and imposed the stigma of being found a member of a criminal association.

### 1. *California Constitutional Right to Trial by Jury*

 "In California, our Constitution [(art. I, § 16)] guarantees the right to a jury trial in actions at law, not those in equity. [Citations.] If the action

---

"m. Being present in a vehicle found to have any contraband, narcotics, or illegal or deadly weapons with knowledge of contraband, narcotics, or illegal weapons;

"n. Possessing instruments commonly used for breaking into locked vehicles, with the intent to do so, including but not limited to: picks, wire cutters, dent pullers, sling shots, steel shots, spark plugs; 'slim jims';

"o. Demanding entry into another person's residence any time of the day or night;

"p. Knowingly hiding people who are evading a law enforcement officer;

"q. Signaling to, or whistling, to warn of the approach of police officers;

"r. Urinating or defecating in any public place open to public view;

"s. Using words, phrases, physical gestures, or symbols commonly known as hand signs which describe or refer to the gang known as Posole; such as: placing the thumb and any other finger together to form an 'O' and extending any other finger or fingers to form a 'P'; separating and two fingers to form a 'V'; placing the elbows together to form a 'V'; placing the hand of one arm on any part of the other arm to form a 'P'; placing the hands, with the fingers forming a half-circle, on top of each other to form the letter 'S';

"t. Wearing clothing which bears the name or letters that spell out the name of the gang known as Posole or associated with the gang known as Posole, such as, but not limited to, any variations or combinations of: 'Posole'; 'Posoles'; 'P'; 'PT'; 'M'; "Eme'; 'Varrio Posole'; 'Varrio Posole Locos'; 'Varrio Posole Loco'; 'Posole Town'; 'VP'; 'VPL'; 'VPLS'; '13'; '20'; '13 20'; '16'; '16 20'; '22'; '22 16'; '22 16 12'; '22 16 12'; '22 16 12 19';

"u. Making, loud noise of any kind, including, but not limited to yelling and loud music at any time of the day or night consistent with Oceanside City Code §§ 38 et seq;

"v. If under the age of eighteen (18), being in a place between the hours of 10:00 p.m. on any day, and sunrise of the immediately following day, unless (1) accompanied by a parent or legal guardian, or by a spouse eighteen (18) years of age or older, or (2) performing an errand directed by a parent or legal guardian, or by a spouse eighteen (18) years or older, or (3) returning directly home from a public meeting, or a place of public entertainment, such as a movie, play, sporting event, dance or school or (4) actively engaged in some business, trade, profession, or occupation which requires such presence."

deals with ordinary common law rights cognizable in courts of law, it is to that extent an action at law. [Citation.] To determine whether the action was one triable by a jury at common law, the court is not bound by the form of the action but rather by its nature, and a jury trial must be granted only 'where the *gist* of the action is legal.' [Citation.] If the action is essentially one in equity and the relief sought depends upon the application of equitable doctrines, the parties are not entitled to a jury trial. Although the legal or equitable nature of a cause of action ordinarily is determined by the relief sought, the prayer for relief in a particular case is not conclusive—and the inclusion of a request for damages as one of a full range of possible remedies does not guarantee the right to a jury trial. [Citation.]" (*American Motorists Ins. Co. v. Superior Court* (1998) 68 Cal.App.4th 864, 871 [80 Cal.Rptr.2d 621].)

 The essence of an action to abate a public nuisance and for injunctive relief is equitable and there is no right to a jury trial. (*People v. One 1941 Chevrolet Club Coupe* (1951) 37 Cal.2d 283, 298 [231 P.2d 832]; *Stell v. Jay Hales Development Co.* (1992) 11 Cal.App.4th 1214, 1221 [15 Cal.Rptr.2d 220]; *Wolford v. Thomas* (1987) 190 Cal.App.3d 347, 353 [235 Cal.Rptr. 422]; *People v. Frangadakis* (1960) 184 Cal.App.2d 540, 545-546 [7 Cal.Rptr. 776].)

Relying on *Pacific Western Oil Co. v. Bern Oil Co.* (1939) 13 Cal.2d 60, 68 [87 P.2d 1045], and *Arciero Ranches v. Meza* (1993) 17 Cal.App.4th 114, 125 [21 Cal.Rptr.2d 127], Englebrecht nonetheless argues he was entitled to trial by jury on the issue of whether he was a member of the Posole gang, citing the rule that if a plaintiff seeks an injunction to restrain the violation of a "common law right," i.e., a right establishable in an action at law, and either the existence of the right or the fact of its violation is disputed, that dispute must be resolved by a jury.

Englebrecht argues our Supreme Court in *People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1102-1104 [60 Cal.Rptr.2d 277, 929 P.2d 596] held that the public right violated by the acts alleged in the People's complaint are "common law rights." He reasons that since he denies being a member of the gang that committed those acts, there is a dispute concerning whether he violated the community's "common law rights" and a jury must decide the dispute.

Contrary to Englebrecht's argument, *Acuna* does not hold that the underpinnings of an equitable action to abate a public nuisance arise from "common law rights." It merely holds that Anglo-American law has long recognized equitable actions to abate "interfer[ence] with the community's

exercise and enjoyment of *rights common to the public.*" (*People ex rel. Gallo v. Acuna, supra,* 14 Cal.4th at p. 1109, italics added.) In such equitable matters, no "legal action" is necessary to establish a disputed "legal right." There is no requirement under the California Constitution for a trial by jury on the issue of Englebrecht's gang membership.

## 2. *Due Process*

■ Englebrecht argues that even if the People's action to abate a nuisance is an equitable one to which article I, section 16 of the California Constitution does not grant a right of trial by jury, he was nonetheless entitled to such a trial based on the federal and California Constitutions' guarantees of due process of law. He relies on a series of cases dealing with various civil or special proceedings that can result in lengthy involuntary confinement and social stigmatization, cases in which California courts concluded that, in general, the full panoply of due process rights, including trial by jury, applicable in criminal cases are applicable to certain noncriminal proceedings. (See *Conservatorship of Roulet* (1979) 23 Cal.3d 219, 235 [152 Cal.Rptr. 425, 590 P.2d 1] [due process requires unanimous jury verdict in "gravely disabled" civil commitment conservatorship proceeding under the Lanterman-Petris-Short Act (LPS Act)][3]; *People v. Thomas* (1977) 19 Cal.3d 630, 644 [139 Cal.Rptr. 594, 566 P.2d 228] [due process requires unanimous jury and proof beyond a reasonable doubt in "narcotics addict" civil commitment proceedings]; *People v. Feagley* (1975) 14 Cal.3d 338, 376 [121 Cal.Rptr. 509, 535 P.2d 373] [due process requires unanimous jury verdict in "mentally disordered sex offender" civil commitment proceedings]; *People v. Burnick* (1975) 14 Cal.3d 306, 332 [121 Cal.Rptr. 488, 535 P.2d 352] [due process requires proof beyond a reasonable doubt in "mentally disordered sex offender" commitment proceedings].)

Englebrecht readily concedes that unlike the situation in the cited cases, he did not face lengthy confinement as a direct result of the proceeding. He argues, however, this is not determinative since he did face an actual loss of liberty in the target area, e.g., he could not associate with any known member of the Posole gang, could not possess weapons or wear gang-related clothing, etc. He further argues that the injunction and the findings supporting it stigmatized him as a member of a criminal association.

### a. *Cases*

The key due process cases in California dealing with the required application of criminal law procedures to noncriminal proceedings are *People v.*

---

[3]See Welfare and Institutions Code section 5350 et seq.

*Burnick* and *People v. Feagley.* Both cases deal with the now-repealed Mentally Disordered Sex Offender Law (former Welf. & Inst. Code, § 6300 et seq.). Under that law when a defendant was convicted of a crime, the trial court, if it found probable cause to believe the defendant was a mentally disordered sex offender (MDSO), could adjourn the criminal proceedings and institute MDSO proceedings. If the defendant was found to be an MDSO, he was committed to a maximum security mental hospital for an indeterminate period. (*People v. Burnick, supra,* 14 Cal.3d at pp. 310-311.)

The issue in *Burnick* was whether the required standard of proof in an MDSO proceeding was preponderance of the evidence, or beyond a reasonable doubt. In resolving the issue, the court looked to the decision in *Specht v. Patterson* (1967) 386 U.S. 605 [87 S.Ct. 1209, 18 L.Ed.2d 326], in which the Supreme Court reviewed a Colorado sex offender law that, like California's MDSO law, could result in an indeterminate commitment for one convicted of a crime based on a postconviction finding. Under the Colorado law, no formal hearing was required for such commitment. (*People v. Burnick, supra,* 14 Cal.3d at p. 315.)

The Supreme Court in *Specht* found that whatever label was given the Colorado proceeding, it resulted in what was essentially "criminal punishment." In listing the due process requirements of such a proceeding, the Supreme Court, however, did not mention either trial by jury or proof beyond a reasonable doubt. Our Supreme Court found no significance in that omission, first because the defendant in *Specht* did not specifically raise those issues and second because it was not until after *Specht* that the Supreme Court held that trial by jury and proof beyond a reasonable doubt were due process requirements in criminal cases. (*People v. Burnick, supra,* 14 Cal.3d at pp. 316-317.)

Our Supreme Court concluded that a defendant in an MDSO proceeding was entitled to the full panoply of due process protections afforded defendants in criminal prosecutions. The court, citing *In re Winship* (1970) 397 U.S. 358, 369-372 [90 S.Ct. 1068, 1075-1077, 25 L.Ed.2d 368], concluded that one of those rights was the requirement that proof be beyond a reasonable doubt. *Winship* made the point that this heightened standard of proof was required when the proceeding could result in a loss of liberty and social stigmatization, i.e., "loss of good name." The *Burnick* court concluded this was true in MDSO proceedings and stated, therefore, that in such proceedings the standard of proof was beyond a reasonable doubt. (*People v. Burnick, supra,* 14 Cal.3d at pp. 318-325.)

In *People v. Feagley,* our Supreme Court again dealt with the MDSO law and the due process rights applicable to it. It was found that Feagley was an

MDSO and that he would not benefit from treatment in a state hospital. Under such circumstance, the law required Feagley to be committed to state prison for an indefinite term. The statutory jury trial rights in MDSO proceedings raised several serious constitutional problems. The complex MDSO procedures required the trial court to make a preliminary determination of whether the defendant was an MDSO and whether he could benefit from treatment in a hospital. As written, the statutory scheme allowed one found an MDSO to demand a jury trial to review the order of commitment only if the trial court found the defendant would benefit from hospital treatment. The Supreme Court noted that such limitation of the right to trial by jury was so blatant a denial of equal protection that it could not be enforced and required jury trials for any person found by the trial court to be an MDSO. (*People v. Feagley, supra,* 14 Cal.3d at pp. 345-348.)

The state's position, however, was that any jury trial reviewing an MDSO commitment was confined to the issue of whether the defendant was an MDSO and did not involve the question of amenability to treatment. Further, the state argued that based on clear statutory language only three-fourths of the jury was required to find MDSO status. The court held that because there was no standard for determining if an MDSO is amenable to hospital treatment, the possibility of error was great and jury trial was required. (*People v. Feagley, supra,* 14 Cal.3d at pp. 348-349.)

The court also held the requirement that MDSO status need be found by only three-quarters of the jury was unconstitutional, first, under the California Constitution both as a denial of due process (art. I, § 7, subd. (a)) and as a denial of the right to a unanimous verdict in a jury trial (art. I, § 16) and second, under the equal protection clauses of both the California (art. I, § 7, subd. (a)) and United States Constitutions (14th Amend.). (*People v. Feagley, supra,* 14 Cal.3d at pp. 350-352.)

As to due process, the court found a close procedural similarity between criminal prosecutions and MDSO proceedings. More importantly, it noted the consequences of an MDSO finding in terms of curtailment of liberty and social stigmatization were very serious and essentially penal in character. As to equal protection, the court noted unanimous jury trials were statutorily required in less serious commitment settings. (*People v. Feagley, supra,* 14 Cal.3d at pp. 352-358.)

In *People v. Thomas, supra,* 19 Cal.3d 630, the court extended *Burnick*'s and *Feagley*'s proof beyond a reasonable doubt and unanimous jury verdict requirements to involuntary narcotics addiction commitments under Welfare and Institutions Code section 3000 et seq. The court did so, noting "if the

proceedings seriously put at risk both the personal liberty and the good name of the individual," then due process requires proof beyond a reasonable doubt and a unanimous jury verdict. (19 Cal.3d at p. 638.)

In *Conservatorship of Roulet, supra,* 23 Cal.3d 219, the court applied the reasoning of *Burnick* and *Feagley* to the appointment of conservators under the LPS Act's grave disability provisions. Those provisions give to conservators the power to involuntarily confine the conservatee in a mental institution for up to a year with the possibility of yearly extensions. The court found such appointments deprive the conservatee of "freedom in its most basic aspects and placed a lasting stigma on [that person's] reputation." (23 Cal.3d at p. 223.)

The court noted a conservatee faces the loss of additional "liberties," including the loss of control of his or her estate and financial dealings. In addition, a person found gravely disabled under the LPS Act suffers numerous statutory disabilities, e.g., the loss of the right to practice a profession, to marry, to vote and to refuse certain types of medical treatment. The court noted a conservatee might be subjected to a greater control of his or her life than one convicted of a crime. (*Conservatorship of Roulet, supra,* 23 Cal.3d at pp. 223-228.)

In *County of Sutter v. Davis* (1991) 234 Cal.App.3d 319 [285 Cal.Rptr. 736], the court concluded due process did not require a jury trial in paternity actions brought by the state. The court found the interests and consequences implicated in such actions, though significant, are simply not as great as in those exceptional civil proceedings where jury trial is required. In *Davis* the defendant in support of his request for jury trial relied on two cases, *Salas v. Cortez* (1979) 24 Cal.3d 22 [154 Cal.Rptr. 529, 593 P.2d 226], and *County of Los Angeles v. Soto* (1984) 35 Cal.3d 483 [198 Cal.Rptr. 779, 674 P.2d 750].

The *Davis* court noted that in *Salas* our Supreme Court concluded defendants in paternity proceedings brought by the state are entitled to appointed counsel. *Salas* noted whether due process requires the appointment of counsel turns on the nature of the proceeding and the interests involved. It noted paternity actions concern more than monetary damages. They deal with the most fundamental of biological relationships and have profound lifelong implications for all involved. When the action is brought by the state, an indigent defendant faces the full power of the government. The state's interest in denying appointment of counsel is solely financial. The court in *Salas* concluded that an accurate factual determination and resolution of the weighty interests involved in paternity cases required counsel to be appointed for indigent defendants. (*County of Sutter v. Davis, supra,* 234 Cal.App.3d at pp. 325-326.)

The *Davis* court noted that in *County of Los Angeles v. Soto, supra,* 35 Cal.3d 483, our Supreme Court again noted the special interests involved in paternity cases and concluded, given the consequences attendant to a finding of paternity were analogous to those flowing from a criminal conviction, a defendant who stipulates to a paternity judgment must understand the consequences of that judgment and be aware of the right to a hearing at which paternity must be proved and at which he is entitled to the appointment of counsel. (*County of Sutter v. Davis, supra,* 234 Cal.App.3d at p. 327.)

The *Davis* court stated the determination of whether a jury trial is required in a civil or special proceeding is guided by the principle set forth in *Salas* that a court " 'must examine the nature and magnitude of the interest involved, the possible consequences [defendant] face[s] and the features which distinguish paternity proceedings from other civil proceedings . . .' keeping in mind that the 'touchstone of due process is fundamental fairness.' [Citations.]" (*County of Sutter v. Davis, supra,* 234 Cal.App.3d at p. 327.)

In conducting that analysis, the *Davis* court first noted that all the cases in which a right to jury trial was found by the California Supreme Court involved the fundamental interests of a person's dignity and liberty. (*County of Sutter v. Davis, supra,* 234 Cal.App.3d at pp. 329-330.) The court found that while a finding of paternity involved a degree of stigma, it did not rise to the level of a finding that a person was, e.g., an MDSO, who required involuntary confinement. (*Id.* at p. 328.)

The *Davis* court summed up: "Under the *Salas* test, we are to balance the action's features and the private interests and consequences against the state's interest in not providing a right to a jury trial in the action. [Citation.] Although the state's interest is largely financial and administrative, as it was in *Salas*, the private side of the scale does not pack much punch either. As noted by the state below, '[g]iven the lack of a right to a jury trial under the more specific provisions of Article I, Section 16, it is difficult to conclude that there is such a right in a paternity case under the more general provisions of Article I, Section 7.' In the end, the denial of a right to a jury trial in a paternity action simply does not impinge upon fundamental fairness. Accordingly, the state due process clause (art. I, § 7(a)) does not require such a right." (*County of Sutter v. Davis, supra,* 234 Cal.App.3d at p. 332.)

In *Iraheta v. Superior Court* (1999) 70 Cal.App.4th 1500 [83 Cal.Rptr.2d 471], the issue was whether there is a constitutional right to the appointment of counsel in actions, like the present one, to enjoin gang activity in a specified target area. The court first noted that in general the right to the

appointment of counsel exists in civil cases only where a litigant's *physical* liberty may be lost. (*Id.* at p. 1503.)

*Iraheta* noted that in *Salas*, however, the court found that an indigent defendant in a paternity proceeding prosecuted by the state was entitled to appointed counsel. The court in *Iraheta* observed that in doing so, *Salas* articulated a test for determining when appointed counsel is required in a civil proceeding. The court " 'must examine the nature and magnitude of the interests involved, the possible consequences [defendants] face and the features which distinguish [that action] from other civil proceedings.' " (*Iraheta v. Superior Court, supra,* 70 Cal.App.4th at p. 1504.)

In finding appointed counsel required in paternity actions brought by the state, *Iraheta* noted *Salas* did not compare the nature of the rights at stake in such an action to the physical liberty interest at stake in criminal cases. Instead, *Salas* looked to a series of other factors, e.g., paternity actions establish a fundamental familial relationship with lifelong social, financial and potentially penal consequences, the district attorney brings the action, and the cases are often factually and legally complex. (*Iraheta v. Superior Court, supra,* 70 Cal.App.4th at p. 1504.)

*Iraheta* noted that two years after the decision in *Salas*, the United States Supreme Court in *Lassiter v. Department of Social Services* (1981) 452 U.S. 18 [101 S.Ct. 2153, 68 L.Ed.2d 640] addressed the question of whether due process required the appointment of counsel in parental status termination proceedings. *Lassiter* found a presumption that appointment of counsel is not required unless the immediate result of the proceeding is a possible loss of physical liberty. Interests other than physical liberty may be so great that due process requires the appointment of counsel but, " 'as a litigant's interest in personal liberty diminishes, so does his right to appointed counsel.' [Citation.]" (*Iraheta v. Superior Court, supra,* 70 Cal.App.4th at p. 1505.)

*Lassiter* concluded that whether a parent has a liberty interest that requires appointment of counsel during termination proceedings must be determined on a case-by-case basis. The test applied is two-prong. First, the court must determine "the private interests at stake, the government's interest, and the risk that the procedures used will lead to an erroneous decisions." (*Lassiter v. Department of Social Services, supra,* 452 U.S. at p. 27 [101 S.Ct. at p. 2159].) Second, the court must balance those three factors "against the presumption that there is a right to appointed counsel only where the indigent, if he is unsuccessful, may lose his personal freedom." (*Ibid.*; *Iraheta v. Superior Court, supra,* 70 Cal.App.4th at p. 1505.) *Lassiter* did not specify the kinds of personal liberty interests that would have the

same weight as a physical liberty interest. (*Iraheta v. Superior Court, supra,* 70 Cal.App.4th at p. 1505.)

*Iraheta* concluded that *Salas* was an application of federal due process law. It further noted that in due process cases after *Lassiter,* the California Supreme Court's reliance on *Lassiter* indicated its test was the one to be applied under either the California or United States Constitution in deciding when due process required the appointment of counsel. (*Iraheta v. Superior Court, supra,* 70 Cal.App.4th at pp. 1506-1508.)

*Iraheta* applied the *Lassiter* balancing test to the requirement for the appointment of counsel in cases in which the state seeks to enjoin gang activity in a target area. It concluded the claimed First Amendment interests of a gang member in such cases are not as weighty as when one's physical liberty or parental interests are directly at stake. The court concluded the state's interest in avoiding the expense of appointed counsel and the cost of the lengthened proceeding that counsel's presence could cause, while not significant enough to overcome parental or physical liberty interests, were sufficient to overcome a gang member's interest in engaging in activities in the target area—activities that deprived others of the enjoyment of their lives and property. (*Iraheta v. Superior Court, supra,* 70 Cal.App.4th at pp. 1511-1512.)

The court also concluded that denying appointed counsel in gang activity abatement proceedings created little risk of erroneous decisions. The court found the fact the case was brought by the state was not determinative since if it were, appointed counsel would be required in every type of case brought by the government. (*Iraheta v. Superior Court, supra,* 70 Cal.App.4th at pp. 1512-1514.) The court also rejected the argument that the complexity of such abatement proceedings requires the appointment of counsel. It noted the only issue that cannot be raised by collateral attack if the petitioner violates the injunction is whether he is a member of the gang. The court concluded gang membership is not a complex issue. (*Id.* at p. 1514.)

*Iraheta* concluded: "Due process does not require that defendants in civil actions to abate the conduct of criminal street gangs as a public nuisance be given legal counsel at public expense. To expand the due process right of legal counsel to the alleged gang members in this case would be unprecedented, and would result in the expansion of the right to counsel to a number of other civil actions. Such a pervasive expansion could place a tremendous financial burden on both the state and local entities. We conclude that petitioners are not entitled to the appointment of counsel." (*Iraheta v. Superior Court, supra,* 70 Cal.App.4th at pp. 1514-1515.)

### b. *Discussion*

The due process cases requiring jury trial all involve situations in which physical liberty was directly at stake. In *County of Sutter v. Davis*, the court concluded due process did not require trial by jury in paternity actions brought by the state even though the interests were weighty and enduring ones. In *Iraheta,* the court weighed the due process considerations in a gang conduct abatement action and concluded appointment of counsel was not required.

In the present case Englebrecht's physical liberty was not directly at stake. While the injunction curtails associational and expressive activities, it does so only in a limited geographic area and only in a limited manner. While some social stigma might arise from the finding that Englebrecht is a gang member, it is not the same order of stigma arising from a criminal verdict or a finding that one is an MDSO or a narcotics addict, or an LPS Act conservatee. The rights involved in this case, while important, are not as significant as the interest in physical liberty or parental rights. While the right to trial by jury is a cherished one, it, unlike the right to notice, and in some instances the right to appointed counsel, is not a necessary feature of a fair hearing. Our system decides many weighty issues with life-altering consequences without requiring a jury trial and readily allows the waiver of a jury even in the most serious of cases. The requirement for a jury trial in gang conduct abatement proceedings would greatly lengthen them and make them far more expensive. We conclude there is no due process right to trial by jury in such actions.

### B. *Standard of Proof*

Englebrecht argues the trial court erred in using a preponderance of the evidence rather than a clear and convincing burden of proof.

### 1. *Law*

Evidence Code section 115 states in relevant part: "The burden of proof may require a party to raise a reasonable doubt concerning the existence or nonexistence of a fact or that he establish the existence or nonexistence of a fact by a preponderance of the evidence, by clear and convincing proof, or by proof beyond a reasonable doubt. [¶] Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence."

In *In re Marriage of Peters* (1997) 52 Cal.App.4th 1487, 1490 [61 Cal.Rptr.2d 493], the court stated: "The degree of burden of proof applied in

a particular situation is an expression of the degree of confidence society wishes to require of the resolution of a question of fact. [Citation.] The burden of proof thus serves to allocate the risk of error between the parties, and varies in proportion to the gravity of the consequences of an erroneous resolution. [Citations.] Preponderance of the evidence results in the roughly equal sharing of the risk of error. [Citation.] To impose any higher burden of proof demonstrates a preference for one side's interests. [Citation.] Generally, facts are subject to a higher burden of proof only where particularly important individual interests or rights are at stake; even severe civil sanctions not implicating such interests or rights do not require a higher burden of proof. [Citations.]"

■■■ "Evidence Code section 115 expressly contemplates exceptions to the preponderance standard developed by the common law, because the determination of the degree of proof to be applied in a particular situation is the kind of question which has traditionally been left to the judiciary to resolve. [Citations.]" (*In re Marriage of Peters, supra*, 52 Cal.App.4th at p. 1490; *Weiner v. Fleischman* (1991) 54 Cal.3d 476, 484-488, 489, fn. 4 [286 Cal.Rptr. 40, 816 P.2d 892]; see also *Santosky v. Kramer* (1982) 455 U.S. 745, 755-756 [102 S.Ct. 1388, 1395-1396, 71 L.Ed.2d 599].)[4]

The law requires the use of the clear and convincing burden of proof either statutorily or, more often, decisionally in a variety of situations across a range of issues.[5]

---

[4]McCormick notes that the clear and convincing test arose from standards prescribed by chancellors for the determination of questions of facts in equity case and was only later applied to cases at law tried by jurys. (2 McCormick, Evidence (5th ed. 1999) Burden of Proof and Presumptions, § 340, p. 426; see generally *Liodas v. Sahadi* (1977) 19 Cal.3d 278, 287 [137 Cal.Rptr. 635, 562 P.2d 316].)

[5]Witkin states: "The principal situations in which the Legislature or the courts have laid down the requirement of this higher degree of proof in civil cases are as follows:

"(1) *Civil commitment of incompetent person.* (See *Addington v. Texas* (1979) 441 U.S. 418, 99 S.Ct. 1804, 1812, 60 L.Ed.2d 323, 335, 7 *Summary* (9th), *Constitutional Law*, § 514; 97 A.L.R.3d 780.)

"(2) *Conscientious objection: showing by alien applicant for naturalization without oath to bear arms that opposition is based solely on religious training and belief.* (*In re Jost* (1953) 117 C.A.2d 379, 383, 256 P.2d 71.)

"(3) *Conservatee's lack of capacity to give written informed consent to convulsive treatment.* (See *Lillian F. v. Superior Court* (1984) 160 C.A.3d 314, 323, 324, 206 C.R. 603.)

"(4) *Deed absolute in form as conveyance subject to trust.* (See *Sheehan v. Sullivan* (1899) 126 C. 189, 193, 58 P. 543; *Spaulding v. Jones* (1953) 117 C.A.2d 541, 545, 256 P.2d 637; *Adams v. Young* (1967) 255 C.A.2d 145, 155, 62 C.R. 877; infra, § 87.)

"(5) *Deed absolute in form as mortgage.* (See *Wehle v. Price* (1927) 202 C. 394, 397, 260 P. 878; *Beeler v. American Trust Co.* (1944) 24 C.2d 1, 7, 147 P.2d 583; 54A Am.Jur.2d,

A review of these situations indicates that the need for a heightened standard of proof arises both from constitutional due process and more

---

Mortgages (1996 ed.) § 111; 3 *Summary* (9th), Security Transactions in Real Property, §§ 9, 10; infra, § 87.)

"(6) *Defamation of public official or public figure: proof of malice.* (See *Tague v. Citizens for Law & Order* (1977) 75 C.A.3d Supp. 16, 25, 142 C.R. 689; *Bindrim v. Mitchell* (1979) 92 C.A.3d 61, 72, 155 C.R. 29 [test met].)

"(7) *Denaturalization proceeding: government's burden.* (See *Chaunt v. United States* (1960) 364 U.S. 350, 81 S.Ct. 147, 149, 5 L.Ed.2d 120, 123.)

"(8) *Deportation proceeding: government's burden.* (See *Woodby v. Immigration & Naturalization Service* (1966) 385 U.S. 276, 87 S.Ct. 483, 488, 17 L.Ed.2d 362, 369; 18 Stanf. L. Rev. 1237.)

"(9) *Minor's capacity to understand wrongfulness of conduct.* P.C. 26(One) provides that a child under the age of 14 is presumed to be incapable of committing a crime without clear proof that the child understood its wrongfulness. The statute imposes a clear and convincing evidence standard; the presumption of incapacity need not be rebutted beyond a reasonable doubt. (*In re Manuel L.* (1994) 7 C.4th 229, 238, 239, 27 C.R.2d 2, 865 P.2d 718, 10 *Summary* (9th), *Parent and Child,* Supp., § 731 [distinguishing *In re Winship* (1970) 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368, which requires reasonable doubt standard for elements of offense].)

"(10) *Oral agreement to make a will.* (See *Lynch v. Lichtenthaler* (1948) 85 C.A.2d 437, 441, 193 P.2d 77; 11 *Summary* (9th), *Equity,* § 29.)

"(11) *Oral transmutation of separate property into community property.* (See *In re Marriage of Weaver* (1990) 224 C.A.3d 478, 487, 273 C.R. 696; 11 *Summary* (9th), *Community Property,* § 127.)

"(12) *Paternity: proof to overcome rebuttable presumptions.* (See Family C. 7612, infra, § 107.)

"(13) *Establishment of probate conservatorship.* (See *Conservatorship of Sanderson* (1980) 106 C.A.3d 611, 620, 165 C.R. 217 [rejecting contention that stricter beyond reasonable doubt standard should be required].)

"(14) *Property acquired after marriage as separate property.* (See *Estate of Nickson* (1921) 187 C. 603, 605, 203 P. 106; *Gagan v. Gouyd* (1999) 73 C.A.4th 835, 843, 86 C.R.2d 733; 11 *Summary* (9th), *Community Property,* § 95.)

"(15) *Public nuisance abatement action: proof of obscenity.* (See *People v. Mitchell Bros.' Santa Ana Theater* (1982) 128 C.A.3d 937, 940, 180 C.R. 728 [opinion after U.S. Supreme Court reversed prior decision requiring proof beyond reasonable doubt].)

"(16) *Punitive damages: oppression, fraud, or malice.* (C.C. 3294(a), governing punitive damages, requires proof by clear and convincing evidence that defendant was guilty of oppression, fraud or malice; see 6 *Summary* (9th), *Torts,* § 1327; 58 A.L.R.4th 878 [standard of proof as to conduct underlying punitive damage awards].)

"(17) *Termination of parental rights.* (See *In re Angelia P.* (1981) 28 C.3d 908, 919, 171 C.R. 637, 623 P.2d 198, 10 *Summary* (9th), *Parent and Child,* § 183; *In re Laura F.* (1983) 33 C.3d 826, 839, 191 C.R. 464, 662 P.2d 922; *Santosky v. Kramer* (1982) 455 U.S. 745, 102 S.Ct. 1388, 1402, 71 L.Ed.2d 599, 617 [requirement of due process].)

"(18) *Waiver of known right.* (See *DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd.* (1994) 30 C.A.4th 54, 60, 61, 35 C.R.2d 515 [waiver of known right must be shown by clear and convincing proof; Supreme Court opinion holding that preponderance standard applied to proof of oral joint venture or partnership agreement did not disapprove clear and convincing standard for all civil cases].)" (1 Witkin, Cal. Evidence (4th ed. 2000) Burden of Proof and Presumptions, § 39, pp. 188-190; see also *Mattco Forge, Inc. v. Arthur*

general public policy considerations. (See fn. 2, *ante*; see also 29 Am.Jur.2d (1994) Evidence, § 157, p. 183.)[6]

## 2. *Discussion*

We conclude that the importance of the interests affected by the injunction in this case requires that the finding of facts necessary to justify its issuance be proved by clear and convincing evidence.

The District Attorney of San Diego County sought to enjoin Englebrecht from particular gang-related activity in the target area. Some of the conduct enjoined involves the commission of crimes, e.g., possessing narcotics. Also enjoined, however, are a host of noncriminal, usually innocuous and wholly ordinary activites, e.g., drinking alcoholic beverages, possessing a glass bottle or a baseball bat or a marker pen or a screwdriver or wire cutters. The injunction enjoins Englebrecht in the target area from appearing "anywhere in public" with any other defendant or known member of the Posole gang. He is enjoined in the target area from making certain forms with his fingers and arms and from wearing clothing bearing certain names and specific letter or number combinations.

We do not suggest, nor do we believe it necessary to find, before requiring proof by clear and convincing evidence, that the interests involved in the enjoined activities rise to the level of physical liberty or parental or First Amendment rights. The interests involve more than a mere dispute over property or money. The need for a standard of proof allowing a greater confidence in the decision reached arises not because the personal activities enjoined are sublime or grand but rather because they are commonplace, and ordinary. While it may be lawful to restrict such activity, it is also extraordinary. The government, in any guise, should not undertake such restrictions without good reason and without firmly establishing the facts making such restrictions necessary.

*Young & Co.* (1997) 52 Cal.App.4th 820, 852, fn. 4 [60 Cal.Rptr.2d 780] (dis. opn. of Croskey, J.).

[6]Courts have also specifically rejected the use of the clear and convincing burden of proof in a variety of cases. For example in *Liodas v. Sahadi, supra,* 19 Cal.3d at pages 286-291, the court concluded that the proper burden in civil fraud actions is preponderance of the evidence. In *Weiner v. Fleischman, supra,* 54 Cal.3d at pages 483-486, the court reached the same conclusion with regard to establishing the existence or scope of an oral joint venture or partnership agreement. In *In re Marriage of Peters, supra,* 52 Cal.App.4th at pages 1490-1493, the court held that in a marital dissolution action the date of separation must be proved by a preponderance of the evidence.

The trial court erred in failing to require the government prove its case by clear and convincing proof.[7]

## C. *Definition of Active Gang Member*

■ Englebrecht argues the trial court used the wrong definition of active gang membership in deciding he was a member of the Posole gang.

### 1. *Background*

In its complaint the district attorney alleged Englebrecht was an active member of the Posole gang. In determining who was an active member of the gang, the district attorney relied on the criteria developed in 1981 by the California Department of Justice Task Force on Street Gangs (Gang Task Force). The criteria are: "1) Subject admits being a member of the gang; 2) Subject has tattoos, clothing, etc., that are only associated with certain gangs; 3) Subject has been arrested while participating with a known gang; 4) Information that places the subject with a gang has been obtained by a reliable informant; 5) Close association with known gang members has been confirmed." An active gang member is a person meeting two or more of these criteria.

Englebrecht asked the trial court to employ the definition of active gang membership stated in *People v. Green* (1991) 227 Cal.App.3d 692, 700 [278 Cal.Rptr. 140]: "To be convicted [pursuant to Penal Code section 186.22, subdivision (a)] of being an active participant in a street gang, a defendant must have a relationship with a criminal street gang which is (1) more than nominal, passive, inactive or purely technical, and (2) the person must devote all, or a substantial part of his time and efforts to the criminal street gang."

The trial court concluded the definition of active gang membership defined by the Gang Task Force was consistent with the California Supreme Court's discussion of gang membership in *People ex rel. Gallo v. Acuna, supra,* 14 Cal.4th 1090, and rejected use of the *Green* test. The court concluded Englebrecht met four of the task force criteria and concluded he was a gang member.

---

[7]Having found that the trial court employed the wrong standard of proof, we would normally be required to determine whether such error was prejudicial. (See e.g., *Conservatorship of Sanderson* (1980) 106 Cal.App.3d 611, 620-621 [165 Cal.Rptr. 217].) Since, however, Englebrecht has been released from the effects of the injunction, it is unnecessary we deal with the issue of prejudice.

## 2. Law

In general, to sustain a petition for a gang abatement injunction against named individuals, it must be proved that the gang and its members were responsible for the public nuisance to be abated and the individual defendants are members of the gang. (*People ex rel. Gallo v. Acuna, supra,* 14 Cal.4th at p. 1125.) The question is, what amounts to gang membership in this context? No case is directly on point.

What is a gang? Penal Code section 186.22, subdivision (f), states a " 'criminal street gang' means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity."

For the purposes of a gang abatement injunction, the above definition would seem adequate with the modification the group have as one of its primary activities not the commission of the enumerated crimes, but rather the commission of the acts constituting the public nuisance. And whose members individually or collectively engage in not necessarily a pattern of criminal activity, but rather a pattern of activity amounting to the public nuisance. (See generally *People ex rel. Gallo v. Acuna, supra,* 14 Cal.4th at pp. 1122-1125.)

In *People v. Green*, the court dealt with the issue of gang membership as a crime. There the defendant was charged with participation in a criminal street gang in violation of Penal Code section 186.22, subdivision (a). That section makes it a crime for any person to "actively participate[] in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and . . . willfully promote[s], further[s], or assist[s] in any felonious criminal conduct by members of that gang."

In *Green* the defendant argued various terms, including "active participation," used in Penal Code section 186.22, subdivision (a), were unconstitutionally vague. Citing *Scales v. United States* (1961) 367 U.S. 203, 223 [81 S.Ct. 1469, 1483, 6 L.Ed.2d 782]—a case dealing with the Smith Act making it a crime to knowingly be a member of an organization advocating the violent overthrow of the government—the *Green* court concluded that to be an active participant in a street gang, it was necessary a relationship exists

between the gang and the defendant which is "(1) more than nominal, passive, inactive or purely technical, and (2) the person must devote all, or a substantial part of his time and efforts to the criminal street gang." (*People v. Green, supra,* 227 Cal.App.3d at pp. 699-700.) So construed, the court found the term "active participant" to be sufficiently certain. (*Ibid.*)

In *People v. Castenada* (2000) 23 Cal.4th 743 [97 Cal.Rptr.2d 906, 3 P.3d 278], our Supreme Court addressed the issue of the proper definition of the term "active participation" as used in Penal Code section 186.22, subdivision (a). In so doing, *Castenada* agreed with *Green* that active participation required a relationship with the gang which is more than nominal, passive, inactive or purely technical. *Castenada* did not agree, however, active participation required the defendant to devote all or a substantial part of this time and effort to the gang. (23 Cal.4th at p. 747.)

*Castenada* noted *Scales*'s holding that " 'mere association with a group cannot be punished unless there is proof that the defendant knows of and intends to further its illegal aims.' " (*People v. Castenada, supra,* 23 Cal.4th at p. 749.) *Castenada* held *Green* read too much into the *Scales* decision. While *Scales* found the substantial time and effort definition of active membership used by the trial court in that case adequate, it did not hold, as *Green* concluded, that it was necessary. Rather, *Scales* held that to be criminally liable for membership in a criminal organization, due process required only the defendant have entertained " 'guilty knowledge and intent' of the organization's criminal purposes." (*People v. Castenada, supra,* 23 Cal.4th at p. 749.) *Castenada* noted section 186.22, subdivision (a), requires, in addition to active participation, the defendant have knowledge the gang engages in a pattern of criminal activity and the defendant willfully promote, etc., any felonious criminal conduct by members of the gang. *Castenada* concluded these elements exceeded the due process requirements for crimes of membership defined in *Scales*. *Castenada* held for the purposes of section 186.22, subdivision (a), active participation means participation which is "more than nominal or passive." (23 Cal.4th at p. 747.)[8]

In *People ex rel. Gallo v. Acuna,* the court dealt, to a limited extent, with the concept of gang affiliation for the purposes of a gang abatement injunctions. In *Acuna* the defendants, admitted gang members or identified by the

---

[8]Section 186.22 was amended in 2000 by addition of section (i), which states: "In order to secure a conviction, . . . it is not necessary . . . to prove that the person devotes all, or a substantial part of his or her time or efforts to the criminal street gang, nor is it necessary to prove that the person is a member of the criminal street gang. Active participation in the criminal street gang is all that is required."

police as gang members, argued they could not be subject to a gang abatement injunction unless each possessed " 'a specific intent to further an unlawful aim embraced by [the gang].' " (*People ex rel. Gallo v. Acuna, supra,* 14 Cal.4th at pp. 1122-1123.) Thus, the court was faced not with defining all the elements of membership or active participation for the purposes of gang abatement injunctions but simply with whether an element was the specfic intent to further an unlawful aim embraced by the gang. (*Ibid.*)

After reviewing *Drivers Union v. Meadowmoor Co.* (1941) 312 U.S. 287 [61 S.Ct. 552, 85 L.Ed. 836, 132 A.L.R. 1200], and *Madsen v. Women's Health Center, Inc.* (1994) 512 U.S. 753 [114 S.Ct. 2516, 129 L.Ed.2d 593]—cases dealing with injunctions against picketing activity—*Acuna* held in a proper case an organization and its individual members may be enjoined from particular conduct without a showing of a specific intent to further an unlawful aim. The court noted labor unions, abortion protestors and other identifiable groups act only through their memberships and it is the usual practice to make the injunction run to "[the] classes of persons through whom the enjoined person may act, such as agents, servants, employees, aiders [and] abettors.' " (*People ex rel. Gallo v. Acuna, supra,* 14 Cal.4th at p. 1124.) In support of this observation, the court cited Federal Rules of Civil Procedure, rule 65(d) (28 U.S.C.), that an injunction " 'is binding only upon the parties to the action, their officers, agents, . . . and upon those persons in active concert or participation with them who receive actual notice of the order.' " (14 Cal.4th at pp. 1124-1125.) The court concluded no different rule need apply when the petitioner seeks to enjoin the members by name rather than the organization. (14 Cal.4th at pp. 1122-1125.)

The court noted the evidence demonstrated it was the gang itself, acting through its membership, which was responsible for the public nuisance to be enjoined. Since the gang itself could have been named as a defendant, the decision to name individual gang members did not change the rule that the organization and its individual members were subject to the injunction. The court concluded for "present purposes", i.e., a preliminary injunction, it was enough that sufficient evidence supported the conclusion the gang and its members were responsible for the nuisance and that each of the individual defendants either admitted gang membership or were identified as gang members. (*People ex rel. Gallo v. Acuna, supra,* 14 Cal.4th at p. 1125.)

3. *Discussion*

We reject Englebrecht's argument the definition of a gang member, as stated in *People v. Green,* requires the defendant "devote all or a substantial

part of his time and efforts" to the gang. That definition was crafted in the context of a criminal statute and, more importantly, was rejected even for that purpose by *Castenada*. We also reject the state's argument the criteria established by the Gang Task Force amounts to a definition of gang membership. Those factors may provide a useful guide for determining if a defendant is a gang member but they do not ultimately define the concept of membership in the gang abatement injunction context.

Because for its purposes there was no need to do so, *Acuna* provides no test for determining whether an individual is a member of a gang responsible for nuisance activity such that he may be enjoined or ultimately found in contempt for engaging in enjoined behavior in the target area. It does not appear, however, *Acuna* requires for a sufficient demonstration of membership any showing the individual had engaged in nuisance activities. (*People ex rel. Gallo v. Acuna, supra,* 14 Cal.4th at p. 1125.)

We conclude for the purposes of a gang injunction an active gang member is a person who participates in or acts in concert with an ongoing organization, association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of acts constituting the enjoined public nuisance, having a common name or common identifying sign or symbol and whose members individually or collectively engage in the acts constituting the enjoined public nuisance. The participation or acting in concert must be more than nominal, passive, inactive or purely technical.

The trial court properly rejected the *Green* test for determining whether Englebrecht was an active gang member. The trial court instead looked to the five-part Gang Task Force test and to evidence relevant to those criteria and Englebrecht's active participation in the Posole. While the trial court, of course, did not articulate the participation test of membership as stated above, its analysis of the issue of membership convinces us that it employed those concepts.

### D. *Scope of Injunction*

■ Englebrecht argues in two respects the breadth of the injunction is greater than is required to achieve the relief sought and thus more burdensome than necessary. First, he argues the injunction's target area is larger than justified by the evidence concerning the geographic scope of gang activity. Second, he argues that portion of the injunction forbidding gang members from being seen together in public in the target area is more burdensome than necessary since it unnecessarily infringes on protected

family relationships. He notes the evidence establishes many gang members are related and live in the target area. Thus, he contends the injunction's associational restrictions not only forbid gang gatherings but also constitutionally protected family gatherings as well.

 An injunction may not burden the constitutional right of association more than is necessary to serve the significant governmental issue at stake. (*People ex rel. Gallo v. Acuna, supra,* 14 Cal.4th at pp. 1115, 1120-1122.) The Constitution shields from government intrusion a limited right of association. One such protected association—not asserted here—is instrumental to forms of political and religious expression and activity. The others— asserted here—are associations with "intrinsic" or "intimate" value. These are "exemplified by personal affiliations that 'attend the creation and sustenance of a family—marriage . . . ; the raising and education of children [citation]; and cohabitation with one's relatives.' [Citation.]" (*People ex rel. Gallo v. Acuna, supra,* 14 Cal.4th at p. 1110.)

 Englebrecht's claim the injunction has a geographic scope greater than is justified by the nuisance proved raises no constitutional issue. Insofar as the injunction's restrictions are nonfamilial, nonpolitical and nonreligious association, in whatever location, it does not touch associations protected by the Constitution. (*People ex rel. Gallo v. Acuna, supra,* 14 Cal.4th at p. 1110.) Insofar as Englebrecht's claim is the evidence does not support the need for an injunction in portions of the target area, it merely involves whether the evidence is sufficient. The parties disagree about the meaning of particular evidence. Since this case is moot we conclude it is unnecessary to address those particular evidentiary questions.

We do think it is appropriate to address the issue of the injunction's claimed unnecessary restriction on Englebrecht's familial associations. Englebrecht does not contest the justification for the general nonassociation provision of the injunction. He merely states it should have been limited in manner to lessen its effect on familial relationships.

As stated in *Acuna,* such an associational "provision seeks to ensure that, within the circumscribed area . . . , gang members have no opportunity to combine. [¶] It is the threat of *collective* conduct by gang members loitering in a specific and narrowly described neighborhood that the provision is sensibly intended to forestall. Given that overriding purpose, the [associational] prohibitions enumerated in [the injunction] are not easily divisible." (*People ex rel. Gallo v. Acuna, supra,* 14 Cal.4th at p. 1121.) The court stated that given the "collective mayhem" described in the declarations supporting the preliminary injunction, it could not say "that the ban on any association

between gang members *within the neighborhood* goes beyond what is required." (*Ibid.*)

*Acuna* addressed the issue of whether a lesser restriction, e.g., limiting association between three or more gang members, within the target area, might be reasonable. The court stated it would leave such determination to the superior knowledge of the trial court but noted the associational limitation existed only in a limited geographic area and only when gang members were in public. The court noted there was no evidence the gang members were engaging in constitutionally protected activity in the target area. Finally, the court noted the "narrow yet irreducible arbitrariness that inheres in such line-drawing." (*People ex rel. Gallo v. Acuna, supra,* 14 Cal.4th at p. 1122.) The court concluded the restriction on association by gang members in the target area was proper.

Collective activity by gang members is at the core of the nuisance the injunction justifiably attempts to abate. While it may be that many gang members are also related by family, and while the injunction's associational restrictions may affect, in the target area, contact between those family members, those facts are not determinative. The injunction places no restrictions on contact between any individuals outside the target area. In the target area the injunction merely requires gang members not to associate in public. While the injunction may place some burden on family contact in the target area, it by no means has, in our view, a fundamental impact on general family association.

Any attempt to limit the familial associational impact of the injunction would make it a less effective device for dealing with the collective nature of gang activity. Englebrecht makes much of the point that gang and familial ties often overlap and gang membership is often multigenerational. While such observation shows the possible unintended effect of gang association restrictions on families, it also indicates that any change in the injunction to allow greater association of family-related gang members would tend to limit the effectiveness of the association provisions. Such a limitation on the injunction would in general also make it more difficult to enforce.

We conclude the injunction as issued has a limited impact on familial relationships. We also conclude any liberalization of the injunction to try to allow greater familial contact in the target area would limit the effectiveness of the injunction. The injunction as issued does not impermissibly burden Englebrecht's associational rights.

E. *Provisions "s" and "t"*

Provision "s" of the injunction forbids Englebrecht in the target area from using "words, phrases, physical gestures, or symbols commonly known as

hand signs which describe or refer to the gang known as Posole." Provision "t" forbids him in the target area from "Wearing clothing which bears the name or letters that spell out the name of the gang known as Posole or associated with the gang known as Posloe, such as, but not limited to, any variations or combinations of . . . ."

Englebrecht argues the provisions violate the First Amendment since they proscribe speech merely because of disapproval of the ideas expressed. In addition, he contends both provisions forbid communicative activity and thus must be as narrowly drawn so as not to proscribe lawful as well as unlawful communication. He contends the provisions are too broad since they forbid, for example, even the use of the name "Posole" in ordinary discourse, ban hand signs or gestures that might be made inadvertently and ban the wearing of clothing with letters or numbers which refer to nongang activities or have nongang meanings, e.g., football jersey numbers or personal initials.

The state argues prohibiting the "throwing" of gang signs and the wearing of gang-associated clothing was proper since the prohibition is content neutral and burdens no more speech than required to serve a significant government interest. In any case, the state argues the behavior could properly be enjoined under the "true threat" or "fighting words" doctrines.

### 1. *Law*

In determining the propriety of governmental action affecting speech, courts apply varying levels of scrutiny depending on the type of speech affected and the purpose of the regulation. In deciding the applicable test in this case, the first question is whether the cited provisions of the injunction are content based or content neutral, i.e., regulate speech without reference to its content. (*Madsen v. Women's Health Center, Inc., supra*, 512 U.S. at p. 763 [114 S.Ct. at pp. 2523-2524]; *Planned Parenthood Shasta-Diablo, Inc. v. Williams* (1995) 10 Cal.4th 1009, 1016-1017 [43 Cal.Rptr.2d 88, 898 P.2d 402].)

"In determining whether a regulation is content-based, the 'princip[al] inquiry . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. [Citation.] The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others. [Citation.]' [Citation.]" (*Berry v. City of Santa Barbara* (1995) 40 Cal.App.4th 1075, 1084 [47 Cal.Rptr.2d 661].)

In *Madsen,* abortion protesters, whose activities were enjoined, argued the restrictions on their speech were content based since they applied only to the speech of anti-abortion protesters. The court noted an injunction, unlike a statute, applies only to the activities and perhaps speech of particular groups or individuals. The court stated: "It does so, however, because of the group's past actions in the context of a specific dispute between the parties. The [party] seeking the injunction assert[s] a violation of [its] rights; the court hearing the action is charged with fashioning a remedy for a specific deprivation, not with the drafting of a statute addressed to the general public." (*Madsen v. Women's Health Center, Inc., supra,* 512 U.S. at p. 762 [114 S.Ct. at p. 2523].)

The court noted in *Madsen* the injunction imposed restrictions affecting the protestors' speech because they had repeatedly violated prior court orders. The court stated: "That petitioners all share the same viewpoint regarding abortion does not in itself demonstrate that some invidious content- or viewpoint-based purpose motivated the issuance of the order. It suggests only that those in the group *whose conduct* violated the court's order happen to share the same opinion regarding abortions being performed at the clinic." (*Madsen v. Women's Health Center, Inc., supra,* 512 U.S. at p. 763 [114 S.Ct. at p. 2524].)

We take this to mean that an injunction, the purpose of which is to enjoin conduct violating the rights of others, is not a content-based regulation of speech even though the injunction may affect the expression of a particular point of view or position. This is so because the basis or purpose of the injunction is not to interfere with the content of the speech affected but the enjoined conduct and the deprivation of rights to which it relates.

Since injunctions that only incidentally affect the content of speech are not content based, the strict scrutiny test—which requires a showing that a regulation is necessary to serve a compelling state interest and is narrowly tailored to achieve that end—is not required. A content-neutral *statute* regulating speech is valid if it is narrowly tailored to serve a significant governmental interest and leaves open ample alternative channels of communication. *Madsen* concluded, however, that injunctions regulating speech differ in important ways from statutes having the same affect and it is reasonable to apply a more stringent test to injunctions affecting speech. The test applicable to content-neutral injunctions is "whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." (*Madsen v. Women's Health Center, Inc., supra,* 512 U.S. at p. 765 [114 S.Ct. at p. 2524].)

## 2. *Discussion*

Provisions "s" and "t" are content neutral. The state's motivation for including these provisions in the injunction is not some disagreement with the content of the communications. The district attorney demonstrated a pattern of criminal and other conduct in the target area by the Posole gang that amounted to a public nuisance. In fashioning a remedy, the court enjoined a number of actions and activities that amount to or contributed to that nuisance. An important aspect of the gang's ability to act collectively, to define its territory, to challenge nonmembers and other gangs and to maintain control by fear and intimidation is its use of gang signs and symbols. It is not the content of these expressions to which the injunction looks but the fact of them and their effect on others. Provisions "s" and "t," therefore, are content neutral.

The question then is whether the injunction burdens no more speech than is necessary to serve a significant governmental interest. The governmental interest here is significant. There is no doubt—and Englebrecht does not argue to the contrary—the activities of the Posole gang in the target area amount to an enjoinable public nuisance. The issue is whether provisions "s" and "t" place a greater burden on speech than is necessary to accomplish the legitimate purpose of the injunction to abate that nuisance. Properly expressed they do not.

Provisions "s" and "t," as written, are broad proscriptions on expressive and communicative conduct. We understand that given the psychological and sociological complexity involved in this situation, it is difficult to formulate restrictions on expression that are effective but do not burden expression unrelated to ends of the injunction.

. The provisions forbid both the use of any words, gestures, hand signs or other forms of communication which describe or refer to the Posole gang and the wearing of clothing which bears the gang name or letters that spell out the gang name. The legitimate basis for the restrictions is that such expression amounts to or contributes to the nuisance enjoined. Gangs use such means of expression to demonstrate affiliation which in turn facilitates collective criminal action, defines exclusive territoriality, intimidates non-gang members and serves as a warning and challenge to members of other gangs. Thus, a narrowly drawn prohibition on such expression is proper.

We think fairly read both sections "s" and "t" mean to enjoin the *conscious expression* of gang affiliation, support and allegiance. Thus, Englebrecht would not be in violation of the sections if he unintentionally, and

with no intent at expression, formed a hand sign interpretable as referring to Posole or wore, for example, a high school football jersey in a football game bearing one of the numbers forbidden by the injunction. So read, the sections are not overly broad.[9]

The judgment is affirmed.

Kremer, P. J., and Haller, J., concurred.

---

[9]It is unnecessary we address the People's claim that provisions "s" and "t" enjoin the use of fighting words or true threats and thus are not entitled to First Amendment protection.