Filed 6/23/14  P. v. Manzo CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE ex rel. JOHN A. RUSSO as City Attorney, | |
| Plaintiff and Respondent, | A133873, A135242 |
| v. | (Alameda County Super. Ct. No. RG10541141) |
| ABEL MANZO, et al., | |
| Defendants and Appellants. | |

The trial court issued two preliminary injunctions against the Norteño street gang and 38 individual defendants, including appellants Abel Manzo and Javier Quintero, whom it found to be active gang members.[1]  On appeal, defendants challenge the injunctions on a number of grounds, including that they are overbroad, and that the evidence does not support the trial court's findings that the Norteños were a public nuisance or that defendants were active members of the gang.  We shall affirm the orders granting the preliminary injunctions.

## I.  BACKGROUND

### A.  Procedural History

By this action, the People of the State of California ex rel. John A. Russo, who was Oakland's City Attorney (the City), sought injunctive relief to abate a public nuisance caused by the conduct of the Norteño street gang, sued as an unincorporated

---

[1] Separate appeals were filed from the two injunctions.  They have been consolidated.

1

association, and 42 individually named alleged Norteño members (collectively, defendants). The complaint alleged that, for years, defendants had used a zone in central Oakland, the proposed "Safety Zone,"[2] to conduct "gang and public nuisance activities" that "threaten[ed] the freedom, health, safety, senses, and right to free use and enjoyment of property of the people who live, work, visit and pass through the proposed Safety Zone." Those activities included selling and using controlled substances, shooting at members of other street gangs in order to claim the "turf," homicides, attempted homicides, rapes, robberies, carjackings, assaults, drinking alcoholic beverages in public, loitering on public sidewalks, riding bicycles on sidewalks, displaying and discharging firearms, and drive-by shootings. Moreover, the complaint alleged, defendants intimidated members of the community by "gathering in groups, flaunting their gang tattoos, flashing gang-related hand signs, wearing distinctively marked clothing, and brandishing their gang name as a sword to strike fear into the heart of the community. . . . The hand signs used by the Defendants reflect the Norteño symbols for the number '14' or the letter 'N,' both of which signify 'Norteño'—'N' is the 14th letter of the alphabet. Defendants will also hold up one finger on their right hand and four fingers on their left to again signify 14. The Quince clique of the Norteños will also flash the number 15, to

_____

[2] The proposed Safety Zone was described as follows: "The eastern boundary starts at Brookdale Avenue, at the intersection of Brookdale Avenue and High Street, then running north along Brookdale Avenue to 35th Avenue and continuing north to Fruitvale Avenue, then moving in a westerly direction along Fruitvale Avenue, then continuing north along Brookdale Avenue to 22nd Avenue, then east along 22nd Avenue to E. 28th Street, then continuing north along 28th Street to 21st Avenue, then moving westerly along 21st Avenue all the way to E 12th Street, then moving southwest along 23rd Avenue until 29th Avenue, then moving south via Glascock Street to Lancaster Street, then moving in an easterly direction along Lancaster Street to 7th Street, then moving south along E. 7th Street, to Fruitvale Avenue, then west along Fruitvale to Alameda Avenue, then continuing south along Alameda Avenue to Howard Street and then to High Street, then moving in an easterly direction along High Street to Foothill Boulevard, then moving south along Foothill Boulevard to 48th Avenue, then moving east along 48th Avenue to Melrose Avenue, then moving north along Melrose Avenue to 42nd Avenue to High Street, then moving east along High Street to the starting point at Brookdale Avenue and High Street."

signify they are Quince Norteños. It is common to see Defendants 'throwing' gang signs within the proposed Safety Zone as they commit crimes, or encounter rival gang members, or for pure intimidation purposes." Because of the fear they inspired, defendants could commit crimes with little concern of being reported to the police, and some local residents hesitated to leave their homes at night. Defendants marked their "turf" in the proposed Safety Zone by painting graffiti on the walls of businesses, residences, and public buildings, on fences, telephone poles, traffic signs, utility boxes, and pavement. The City sought an injunction against defendants engaging in certain activities within the proposed Safety Zone, including associating with known Norteño gang members in public; intimidating witnesses; possessing firearms; marking buildings with graffiti; selling, possessing, or using drugs; trespassing; using gang signs; wearing red clothing or displaying gang symbols; gang recruitment; preventing members from leaving the gang; loitering; or violating a curfew.

The City moved for a preliminary injunction. As relevant here, the hearing on the proposed preliminary injunction proceeded in two phases. In phase one, the trial court granted the proposed preliminary injunction as to the Norteños and five individual defendants, Alberto Acosta, Antonio Lambaren, Abel Manzo, Joey Anthony Martinez, and Javier Quintero. The preliminary injunction required the People to provide an "Expedited Administrative Process ('Opt Out')" procedure to allow individuals to dispute their alleged gang membership or to show that they were no longer gang members. In phase two, the trial court also granted the proposed injunction as to other defendants, some of whom were in custody. The phase two preliminary injunction provided for a mediation process for those who contended they were not, or no longer were, gang members.

In granting the preliminary injunctions, the trial court found, "The People have presented sufficient evidence that the conduct of the Norteños criminal street gang and the actions of the individually named defendants . . . acting individually and collectively, constitute a public nuisance in the Safety Zone. Their behavior constitutes a nuisance in that their behavior—including but not limited to, narcotics possession for sales, graffiti,

3

firearms possession, frequenting known gang areas, keeping company with known gang members, displaying gang colors, signs, and other indicia, intimidating witnesses, and assaulting citizens—is indecent and offensive to the senses, interferes with the comfortable enjoyment of life and property, and is injurious to the health of the people in the Safety Zone."

The court stated in its orders that it was relying, in part, on the declaration of Officer Douglass Keely and transcripts of testimony from several days of the trial.

*1. The Norteños*

Officer Keely, of the Oakland Police Department, prepared an expert declaration in November 2010, and testified at trial. Keely had extensive training and experience with criminal street gangs, including Hispanic gangs, had taught courses in Hispanic gang awareness, and had testified and qualified as an expert in the area of Hispanic gangs, specifically the Norteños, Border Brothers, and Sureños criminal street gangs. According to Keely's declaration, the Norteños claimed the entire proposed Safety Zone as their own "turf." By doing so, they sought to occupy it exclusively for committing criminal activities without competition from other gangs or fear of residents reporting crimes or testifying against them. Norteño gang members would congregate at "strategic locations" to stake their claim to their turf, take over apartment buildings to sell narcotics, and commit crimes on their turf. In order to create a controlled area for their drug dealing and criminal behavior, the Norteño gang had to define their turf by loitering in public places, wearing gang symbols, and vandalizing the neighborhood, and defend their turf by committing acts of violence against rivals, carrying weapons, and intimidating residents and merchants.

According to Keely, the Norteños are a "prison-recognized violent criminal street gang with a substantial presence in Northern California, specifically Oakland." The Norteños use and "claim" the number 14, which stands for the fourteenth letter of the alphabet, N. It may be exhibited in various ways, including the number 14, the Roman numeral XIV, dots representing "1" and "4," or hand signs with those two numbers. Oakland Norteño gang members often wear clothing that highlights the letter N or the

4

number 14, and often wore red clothing and accessories. They also commonly wear clothing and accessories representing a specific clique; for instance, accessories with "XV" represent the number 15, and the Quince Norteño clique from East 15th Street. Gang members commonly "throw" gang signs within the proposed Safety Zone when they commit crimes or approach a potential rival gang member. They often wear gang tattoos; a non-gang member with a visible gang tattoo would suffer reprisals from the gang. The various cliques of the Norteño gang are smaller subsets of the larger gang, typically did not fight among themselves, and commonly committed crimes together.

The Norteño gang is the "street-level" component of the prison gang "Nuestra Familia." When entering prison, Oakland Norteño gang members would claim allegiance to the Norteños. According to Keely, "[w]hen an individual admits Norteño membership it is especially telling. Norteños are housed in the main area of the jail/prison. Therefore, even if they do not claim membership they will be housed with other Norteños. This is different from the Sureño and Border Brother gang members, who must claim allegiance or become housed in the main section and risk attack from their rivals, the Norteños." Gang members on the street might act either based on orders from prison or on their own accord. Older gang members on the street become "shot callers," who direct other gang members to carry out tasks, such as shootings or robberies, and manage street-level operations such as the distribution of weapons, narcotics sales, protecting the gang's turf, recruiting new members, and physical violence against rival gangs. The newest, youngest members do much of the "grunt work" of committing crimes. The younger members also commit random acts of violence without direction from the shot callers. The Norteño gang recruits young members from two high schools and two middle schools within the proposed Safety Zone. Students are subject to threats and violence. Members of gangs could leave the gang by "different routes." Some get "beaten out," and others may "fade away" by separating themselves from gang activities. However, if they keep returning to the neighborhood, they are still "respected and looked upon as gang members."

Keely opined that the Norteños were the most dangerous of the Hispanic street gangs in Oakland, that they traveled throughout the city to commit acts of violence against rival gang members, that gang members shot at rival gangs indiscriminately and vandalized public and private property to mark their "turf," and that the younger members used increasingly high levels of violence to impress older members.

Keely explained the factors he used in deciding whether the individual defendants were Norteño gang members: "self-admission, identification by others including rival gang member informants and other law enforcement agencies, history of criminal acts (including the type and location of criminal acts), association with known members of the Norteño gang, frequenting gang territory, the wearing of gang clothing and tattoos, and possession of gang graffiti on personal property," as well as depiction in gang photos, with other gang members, flashing gang hand signs, showing gang tattoos, or brandishing weapons or drugs. These, he explained, were "the same criteria used by law enforcement officers throughout the State of California to identify gang members."

### 2. The Individual Defendants

#### a. Abel Manzo

Keely opined that the individual defendants, including Manzo and Quintero, were active members of the Norteños. Manzo had two adult convictions: felony possession of marijuana for sale and sale of marijuana (Health & Saf. Code, §§ 11359 & 11360) in 2005, and misdemeanor possession of marijuana (Health & Saf. Code, § 11357) in 2004. In 2006, Manzo was seen "peering towards a murder scene several times in the 2200 block of E. 15th Street. Manzo was uncooperative and evasive. . . . This is known Norteño turf, and the murder victim was believed to be a Norteño gang member." In 2009 Manzo was seen "associating with numerous gang members in an area where a shooting had just occurred. Manzo was arrested for violating his probation conditions which include a prohibition from associating with other gang members."

Dalen Randa, a probation officer who worked on the Oakland Gang Task Force, testified at trial that he supervised a small case load of gang members. Manzo had been

6

on probation since 2005, and Randa began working with him in late 2006.[3]  Randa originally transferred Manzo to his case load because he saw him on East 15th Street with several other men Randa knew to be gang members; both Manzo and the others were wearing red.  In December of the same year, Manzo came to the probation center wearing a red memorial t-shirt for a young gang member, with "East 15th" on the back.  In Randa's experience, it would be unusual for someone not affiliated with a gang to wear such a shirt.  At Randa's recommendation, the court added gang restrictions to the terms of Manzo's probation, including the requirement that he not loiter on the 2200 block of East 15th Street.  Manzo was informed of the new conditions, and did not dispute them. In March 2007, Manzo was found in violation of his probation because he embezzled his employer's gas card and used it on various occasions to buy gas in the area around the 2200 and 2300 blocks of East 15th Street.  In October 2007, during a search of Manzo's room, Randa found items of clothing that appeared to be gang related.  Those included shoes with red on them, and shoes and a hat with the number "23" on them, which he said represented the 2300 block of East 15th Street, in Quince Norteño territory.  In September 2009, Manzo attended the funeral of a Norteño gang member who had been killed; other Norteños were present at the funeral.  After he left, there was a gang-related shooting.  Based on what he knew of Manzo, Randa concluded that he was a member of the Norteño Quince gang.  Randa testified that he based this conclusion on "who I have observed him with, the colors I have seen him wearing, his constant draw back to that area."[4]

Officer Eric Milina of the Oakland Police Department knew Manzo from his time at patrol in the area of 23rd Avenue and East 15th Street.  He believed Manzo was a gang member.  He based this opinion on the facts that Manzo had been "out there in the location of the Quince gang members with other Quince gang members," that Manzo's cousin and brothers were leaders of the group, the clothing he wore, and the fact that he

[3] Manzo was no longer assigned to an active probation officer.

[4] Manzo had an aunt who lived on East 15th Street.  He had been told he could go to and from visits with his relatives there, but could not hang out on the street.

went to the funeral of the slain gang member in 2009 and shook hands with other gang members in the parking lot. Milina testified that nearly all of those outside at the funeral were wearing red. After Manzo left, a truck drove by the funeral home twice. A known Norteño gang member who had been in the parking lot shot at the truck three or four times, apparently at the behest of two other gang members, who were also individual defendants in this case.

### b. Javier Quintero

Quintero had been convicted of felony possession of marijuana in 2007 (Health & Saf. Code, § 11357) and misdemeanor carrying a concealed weapon in a vehicle (former Pen. Code, § 12025; see Pen. Code, § 25400) in 2001. In 2007, Quintero admitted to Keely that he had Norteño associations. According to Keely, Quintero was a member of the "Untouchables" Norteños clique. In 2004, officers responded to a report that a large group of gang members was hanging out in a known Norteño area, and that one had a gun. Quintero was among the group and started to run when officers arrived. In 2007, Quintero was found in a vehicle that smelled of marijuana, along with three others who admitted to associations with the Norteño gang. Inside the car were a gun, a digital scale with marijuana residue, a bag with suspected marijuana, and a bag containing small baggies. Quintero told Keely he was associated with the Norteño gang. In the same year, Quintero was found with two known Norteños gang members in a known Untouchables Norteño gang area. A search of him and his vehicle revealed over an ounce of cocaine, 100 unused small plastic zip lock baggies, and a digital scale. These kinds of drug crimes were often committed "in furtherance of and for the prestige of the gang."

In 2008, officers who were performing a parole search of Quintero found him leaving a shed at the back of a property. When he saw the officers, he ran back toward the shed. No other gang members were present in the shed. Officer searched the shed, and found it "covered with gang graffiti for the Norteño street gang and the Untouchables, which is a clique of the Norteños. There was also a carved piece of wood with gang graffiti, a sign on the shed with 'Untouchables 4th', and an envelope with Norteño graffiti." Officers also found a loaded semiautomatic gun inside a box marked

8

"Untouchables," a sawed-off shotgun, two rifles, a bulletproof vest and a vest cover marked "police" on the front, ammunition, marijuana, digital scales, packaging bags, and a pistol holder.

Officers responded to a report of gang members loitering and drinking in public in 2009. Quintero and another individual defendant were found loitering in a Norteño Untouchable gang area in the Safety Zone. Both had told Keely they were Norteños gang members. In April 2010, Quintero was found in a vehicle with three other known Norteño gang members in a known Norteño gang area in the Safety Zone. In May 2010, Quintero was found with other Untouchable Norteño gang members on Norteño gang turf. One of them had a green handkerchief over his face. Keely knew the Untouchables claimed the colors green and red to represent their loyalty to the Norteños.[5] In March 2011, Quintero was found in the front seat of a vehicle; four others, including another individual defendant, were present, and marijuana was found in the back seat. The vehicle contained a red bandana between the front driver and passenger seats, and a boom box in the trunk that was covered in graffiti that referred to the Norteños and the Untouchable clique.

Keely opined that Quintero was an active member of the Norteños; he based this conclusion on "previous arrests, contacts, speaking to informants, [and] speaking to people in the neighborhood."

## II. DISCUSSION

### A. Preliminary Considerations

Before reaching the merits of defendants' appeal, we first consider the propriety of their appellate briefs. California Rules of Court,[6] rule 8.204 provides that the appellant's opening brief must "[p]rovide a summary of the significant facts limited to matters in the record" (rule 8.204(a)(2)(C)), and that all briefs must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter

---

[5] In his testimony, Quintero acknowledged that the Untouchable Nortenos claim the colors green and red.

[6] All rule references are to the California Rules of Court.

appears" (rule 8.204(a)(1)(C)). Defendants have failed to adhere to these requirements. Their opening brief contains pages of factual assertions that are almost or entirely devoid of record citations, and a supplemental reply brief submitted by one of appellants' counsel on appeal contains a total of three record citations in its ten pages. To the extent defendants' arguments are not supported by citations to the record, we shall consider them waived. (See *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246–1247 (*Nwosu*).)

Equally serious, in our view, is the tone of much of defendants' briefing on appeal. Appellants' opening brief is replete with what can only be described as rants: appellants describe this action as "part of the City Attorney's cynical scourging of 'Norteños', and poverty, and people of color; and its warning: we will rely on Suppression, uber alles." They argue that the court below "was satisfied with, *Zero* evidence [that defendants disturbed the peace in the Fruitvale neighborhood of Oakland] . . . only [an officer's] own glowering insistence that he just knew; this was poppycock," and that during his testimony, the officer "worked . . . alertly and smoothly to lard the record" with "poison . . . in aid and defense of his dedicated campaign" against defendants. They argue that defendants are faced with "constant, recurring tyranny and menace from aggressive, antagonistic police, who are themselves very much bent, *inter alia*, on farming corporeal fodder for a voracious 'prison-industrial complex' in this state," that the conclusion that defendant caused a public nuisance "is borne out only by[] the perfervid, antagonistic, materially interested, moralistic imagination of the purported expert," and that the court's order was based on its acceptance of "a mythology, framed around . . . a deep, singular instinct for repression, broadly shared within the system, . . . which is itself, surely, firmly tethered to the never-flagging, ravenous, flesh-eating demands of the prison-industrial complex." This argument goes beyond the bounds of acceptable advocacy and is unsupported by the record. As stated in *Pierotti v. Torian* (2000) 81 Cal.App.4th 17, 32, "the tone of counsels' brief suggests it was more cathartic than tactical. However, an opening brief is not an appropriate vehicle for an attorney to 'vent his spleen' after losing [below]." We caution appellants' counsel to maintain professional decorum in all of their communications to this court.

10

## B. Standard of Review

"At this initial stage in the proceeding, the scope of our inquiry is narrow. We review an order granting a preliminary injunction under an abuse of discretion standard. [Citations.] Review is confined, in other words, to a consideration whether the trial court abused its discretion in ' "evaluat[ing] two interrelated factors when deciding whether or not to issue a preliminary injunction. The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm the defendant is likely to suffer if the preliminary injunction were issued." ' " (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1109 (*Acuna*); see also *Robbins v. Superior Court* (1985) 38 Cal.3d 199, 205–206.) However, "the specific determinations underlying the superior court's decision are subject to appellate scrutiny under the standard of review appropriate to that type of determination. [Citation.] For instance, the superior court's express and implied findings of fact are accepted by appellate courts if supported by substantial evidence, and the superior court's conclusions on issues of pure law are subject to independent review." (*Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 739 (*Smith*).) Thus, although the trial court was required to (and did) find by clear and convincing evidence that the City had presented sufficient evidence to show it was entitled to a preliminary injunction (*People v. Englebrecht* (2001) 88 Cal.App.4th 1236, 1256), our inquiry in reviewing factual issues is whether substantial evidence supports the trial court's determinations. (*Smith*, *supra*, 182 Cal.App.4th at p. 739; see also *Crail v. Blakely* (1973) 8 Cal.3d 744, 750 [where trial court was required to factual finding by clear and convincing evidence, appellate court reviews findings for substantial evidence].)

## C. Use of Civil Injunctions Against Gang-Related Activity

"The use of civil injunctions to abate gang-related problems is a relatively new law enforcement approach that relies on the centuries-old public nuisance law.

[Citations.] Public nuisance law originated from the ancient maxim, ' "*sic utere tuo ut alienum non laides*," ' which means 'one must so use his rights as not to infringe on the rights of others.' [Citation.] [¶] As early as 1872, California codified the common law definition of public nuisance in Penal Code section 370: '[a]nything which is injurious to health, or is indecent, or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property by an entire community or neighborhood . . . .' Civil Code sections 3479 and 3480, also enacted in 1872, have virtually identical definitions. The remedies against a public nuisance are (1) indictment or information, (2) civil action, or (3) abatement. (Civ. Code, § 3491.) Code of Civil Procedure section 731 authorizes district attorneys and city attorneys to seek enjoinment of public nuisances within their jurisdictions in the name of the people of the State of California. [¶] Either criminal or noncriminal conduct may be abated, but the equitable remedy lies only 'where the objectionable activity can be brought within the terms of the statutory definition of public nuisance. [Citation.] A nuisance must be substantial and unreasonable to qualify as a public nuisance and be enjoinable." (*In re Englebrecht* (1998) 67 Cal.App.4th 486, 492.)

### D. Scope of the Preliminary Injunctions

Defendants contend the preliminary injunctions are improper because they cover too broad a geographic territory. Although its shape is irregular, the Safety Zone in this case appears to be approximately two square miles.

For their argument, defendants rely on *Acuna*, in which our high court upheld a gang injunction that applied to a four-block residential area that was subject to the activities of gang members who lived elsewhere; these activities included congregating on lawns, sidewalks, and apartment complexes at all hours, openly drinking and using drugs, marking property with graffiti, public urination, engaging in loud talk, loud music, fistfights, and firing guns, and crimes such as murder, attempted murder, drive-by shootings, assault and battery, vandalism, arson, and theft. (*Acuna*, *supra*, 14 Cal.4th at

12

pp. 1100, 1120.)  In upholding the injunction, the court noted that it was " 'confined,' encompassing conduct occurring within a narrow, four-block residential neighborhood." (*Id*. at p. 1123.)

As defendants acknowledge, since *Acuna* was decided, a number of cases have upheld injunction areas larger than the one in *Acuna*.  The "Target Area" of a gang injunction in *In re Englebrecht* encompassed roughly one square mile.  (*In re Englebrecht*, *supra*, 67 Cal.App.4th at p. 489.)  A gang member subject to a preliminary injunction argued that *Acuna* did not control the case because "(1) the Target Area here is significantly greater than the four-block area in *Acuna*; and (2) none of the defendant gang members in *Acuna* lived in the Target Area, whereas some of the defendant Posole gang members either live in the Target Area or have relatives who do."  (*Id*. at p. 495.) The Court of Appeal rejected both contentions, stating, "No one disputes that the geographical area of the Target Area here is considerably larger than the Target Area in *Acuna*.  However, relative size is not determinative.  What matters is whether the Target Area in this case burdened 'no more speech than necessary to serve a significant government interest.'  [Citation.]  The Target Area encompasses . . . the turf of the Posole gang and the area that the gang has made a public nuisance.  Despite its larger size, the Target Area is well-defined by distinct boundaries—highways and major streets.  The injunction specifically and narrowly describes the Target Area within legal requirements. There has been no showing that the Target Area is larger than it need be to abate the public nuisance."  (*Ibid*.)  Without discussion, other courts have upheld injunction areas larger than that at issue here.  (See *People ex rel. Reisig v. Acuna* (2010) 182 Cal.App.4th 866, 869,[7] [2.98-square-mile injunction area]; *People ex rel. Totten v.*

---

[7] This case did not involve the same gang, injunction, or defendant as those in our high court's *Acuna* decision.  (*People ex rel. Reisig v. Acuna*, *supra*, 182 Cal.App.4th at p. 869 [Broderick Boys gang in the City of West Sacramento]; *Acuna*, *supra*, 14 Cal.4th at pp. 1099–1100 [Sureños gangs in San Jose].)

*Colonia Chiques* (2007) 156 Cal.App.4th 31, 37 [6.6-square-mile safety zone]; see also *In re Englebrecht*, *supra*, 67 Cal.App.4th at p. 489 [one-square-mile zone].) Defendants acknowledge this authority, but argue that it was wrongly decided. We are not persuaded to depart from this precedent.

As was the case in *In re Englebrecht*, defendants have not shown the Safety Zone is larger than is necessary to abate the public nuisance. They argue that there was "*Zero*" evidence to support this conclusion. Not so. The record contains the expert declaration of Officer Douglass Keely of the Oakland Police Department, who had been employed with the police department for 11 years and had extensive experience with gang activity and crimes in Oakland. Keely testified that the Norteño gang claims as its "turf" the entire area described within the Safety Zone, and that the Safety Zone included the area where a "high concentration of the nuisance crimes and activities are committed, and where the community has been hit the hardest by this gang's activities. By claiming and protecting a 'turf,' the Norteños seek to exclusively occupy it for committing criminal activities without fear of competition by other gangs, or worrying about residents reporting the crimes or serving as witnesses."

Moreover, Keely averred that based on his police work, he knew "that the Norteño criminal street gang is the most dangerous of the three [Hispanic gangs in Oakland]. The Norteños travel throughout the City to commit acts of violence against members of the Sureños and the Border Brothers. Whereas some gangs are concerned with maintaining a narcotics trade, the Norteños are also greatly concerned with maintaining members and turf for the gang. They hunt down rival gang members in order to maintain their power within Oakland. The Norteños are also the most dangerous because they have the largest numbers of members within Oakland . . . . [¶] [] The Norteños and their rival gangs, the Sureños and the Border Brothers, have created a public nuisance within the proposed Safety Zone. Gang members shoot at rival gangs indiscriminately and constantly vandalize public and private property to mark their 'turf.' These very public criminal

14

activities create a nuisance which is felt within the location where the crimes are committed, but which also have an 'echo effect' which is felt by residents throughout the neighborhood. Sounds of gunshots, for example, are heard throughout the neighborhood, causing fear in households blocks away from where the guns are actually being fired. Bullets often strike and penetrate buildings and vehicles in and around the proposed Safety Zone."[8]

There is also evidence that Norteños recruit, harass, and intimidate middle school and high school students, both on campus and off campus, and that multiple schools are located within the Safety Zone. At trial, Keely testified that rather than being concentrated at a single "hot spot," Norteño gang activity took place throughout the Safety Zone, all of which the Norteños claimed as their own, and that the reason the boundaries of the Safety Zone had been defined as they were was that "there are so many spots that's dominated by the Norteño gang that creates these kind[s] of nuisance and problems that we had to do the whole thing engulfing the whole [area] so they don't move from one spot to the other." Randa, the probation officer, testified that gang activities took place throughout the entire Safety Zone, in yards, backyards, alleys, and side streets.

In response to this evidence, defendants simply assert that it is inadequate because the evidence did not include dates and locations of specific incidents. But they provide no authority suggesting that the evidence before the court, provided in part by a law enforcement officer with extensive experience and knowledge of Oakland street gangs,

---

[8] We reject defendants' contention, made in their reply brief, that Keely's declaration lacked an evidentiary basis and should not have been considered.

15

was inadequate to show that the Safety Zone was appropriate. We see no abuse of the trial court's discretion in setting the boundaries of the Safety Zone.[9]

There is another reason we reject defendants' argument. In effect, defendants are challenging the sufficiency of the evidence to support the trial court's determination that the conduct of the Norteños constitutes a public nuisance in the Safety Zone. In making their argument, however, defendants violate a "fundamental rule of appellate practice obligating [them] to completely and fairly summarize the evidence supporting the court's findings and judgment." (*Arechiga v. Dolores Press, Inc.* (2011) 192 Cal.App.4th 567, 571.) "Failure to set forth the material evidence on an issue waives a claim of insufficiency of the evidence." (*Brockey v. Moore* (2003) 107 Cal.App.4th 86, 96.) In their opening brief, defendants manifestly fail to set forth the evidence supporting the trial court's findings. The "Statement of Facts" in their opening brief consists entirely of citations to the complaint, factual assertions devoid of citations to the record, brief references to and excerpts from their own counsel's examination of Officer Keely at trial, evidence from their own expert, which was not admitted at trial, and evidence that defendants argue showed that Manzo and Quintero were not active gang members. Defendants present no more evidence in the portions of their brief in which they argue that the evidence did not show the Norteños created a public nuisance in the entire Safety Zone. In so doing, defendants simply ignore the evidence, recited above, on which the trial court relied in finding the Norteños created a public nuisance in the Safety Zone. Appellants make a belated effort to recite some of that evidence in their reply brief, but

---

[9] In a related but separately headed argument, defendants assert that the trial court "erred and abused its discretion in finding that the 'Nortenos' were a [p]ublic [n]uisance, throughout the Fruitvale, which the individual defendants were all part of." To the extent this argument differs from that previously discussed, it is waived because it consists entirely of assertions that lack record citations (*Nwosu, supra,* 122 Cal.App.4th at p. 1246) or citations to authority (*Pringle v. La Chapelle* (1999) 73 Cal.App.4th 1000, 1003).

16

cannot be said to have done so fully. (See *Brockey v. Moore*, *supra*, 107 Cal.App.4th at p. 96.) Not only have defendants thereby waived their argument, but we conclude the evidence is sufficient to support the trial court's findings.[10]

## E. Exclusion of Defendants' Expert Witness

Defendants contend the trial court abused its discretion in excluding the evidence of their proffered expert, Dr. Barry Krisberg. We review a trial court's decision to admit or exclude evidence for abuse of discretion. (*People v. Williams* (1997) 16 Cal.4th 153, 196–197.)

Krisberg is the Research and Policy Director of the Chief Justice Earl Warren Institute on Law and Social Policy at the University of California, Berkeley, School of Law. Defendants submitted his expert declaration, in which he stated his qualifications—which the trial court agreed were "very substantial and impressive"—and opined that research showed that gang injunctions had limited utility in reducing crime, that other methods to combat gang-related crime were available to police departments and district attorneys, that gang injunctions were a waste of resources and could increase alienation in targeted communities, that gang injunctions could cause " 'collateral damage' " to non-gang members who wore gang colors or shared cultural ties with gang members, that gang injunctions could cause displacement of members of minority groups, and that they could lead to increased gang activity.

Defendant sought to have Krisberg testify at trial, and the City objected. On voir dire, Krisberg testified that he had not studied the Norteños in the Fruitvale district of

---

[10] Defendants also make what amounts to a blanket challenge to all gang injunctions when they argue that the trial court abused its discretion in granting preliminary relief because there was no reason to believe any particular defendant would commit gang-related crimes in the future. They argue, "the very notion of such prophetic power exposes the spurious basis of the gang injunction; and really any gang injunction." Defendants provide no basis to distinguish the preliminary injunction at issue here from that upheld by our high court in *Acuna*, *supra*, 14 Cal.4th 1090, and we reject this challenge.

17

Oakland, that he had received no specialized training about the Norteño gang, that he had never testified in a case involving the Norteño gang or been qualified as an expert in the Norteño gang, that he knew nothing about the criminal history of any of the individual defendants or their involvement in the Norteños, that he had not come to any conclusions about whether any of the named individual defendants were Norteño gang members, that he had not spoken with any victims of crimes committed by the Oakland Norteños, that he had never spoken to a former Norteño from the Fruitvale district, and that he had not researched the Fruitvale area Norteños' alliances, structure, methods of operation, terminology, tattoos, clothing, accessories, graffiti, or crimes. The trial court sustained the City's objection, ruling that defendant had not shown Krisberg's testimony would be relevant to the issues before the court; the court went on to state, "[t]he policy questions are for a different branch of government."

Defendants contend this ruling was an abuse of discretion. According to defendants, Krisberg's opinion that gang injunctions were ineffective in curtailing crime would have aided the court in balancing the equities; that is, in weighing "the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm the defendant is likely to suffer if the preliminary injunction were issued." (*Acuna*, *supra*, 14 Cal.4th at p. 1109.) Defendants also contend Krisberg's testimony could have offered insight into "all the issues about gang membership and its implications and portents, supposed gang rules—and signs, and graffiti, colors, symbols, tattoos, etc—all going to the burning question of these many diverse defendants' allegedly 'active' status as gang members." However, defendants have drawn our attention to no authority suggesting a trial court abuses its discretion by failing to take evidence on the kind of broad policy issues Krisberg was prepared to address. In light of Krisberg's admitted lack of knowledge of the Norteño gang, gang activity in the Fruitvale district of Oakland, or the backgrounds of the individual defendants, we cannot conclude the trial court's evidentiary ruling amounted to an abuse of its broad discretion.

18

## F. Individual Defendants Manzo and Quintero

Defendants argue the evidence does not support the trial court's finding that the individual defendants, and in particular Manzo and Quintero, were active gang members.[11] "[F]or the purposes of a gang injunction an active gang member is a person who participates in or acts in concert with an ongoing organization, association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of acts constituting the enjoined public nuisance, having a common name or common identifying sign or symbol and whose members individually or collectively engage in the acts constituting the enjoined public nuisance. The participation or acting in concert must be more than nominal, passive, inactive or purely technical." (*People v. Englebrecht*, *supra*, 88 Cal.App.4th at p. 1261.)

In upholding a preliminary injunction against a contention that the individual defendants could not be bound unless there was proof each had a " 'specific intent to further an unlawful aim embraced by [the gang],' " our high court in *Acuna* ruled: "For present purposes, it is enough to observe that there was sufficient evidence before the superior court to support the conclusions that the gang and its members present in [the neighborhood] were responsible for the public nuisance, that each of the individual defendants either admitted gang membership or was identified as a gang member, and that each was observed by police officials in the [neighborhood]. . . . [I]ndividualized proof [that each defendant committed acts that comprised specific elements of the public nuisance] is not a condition to the entry of preliminary relief based on a showing that it is

---

[11] In an argument made for the first time in their reply brief, defendants contend the trial court failed to make the finding that the Phase One defendants, who included Manzo and Quintero, actively participated in a criminal street gang. We do not consider arguments made for the first time in the reply brief. (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 548; *Moran v. Endres* (2006) 135 Cal.App.4th 952, 956.) In any case, the trial court in fact made this finding in its statement of decision.

the gang, acting through its individual members, that is responsible for the conditions prevailing in [the neighborhood]." (*Acuna*, *supra*, 14 Cal.4th at pp. 1122–1123, 1125.)

The evidence here meets these standards. As to Quintero, there was evidence that he had admitted to Norteño associations, that he associated with groups of gang members in circumstances that included the presence of gang colors and of drugs, apparently for sale, that drugs crimes were often committed for the sake of the gang, and that he was found in a shed covered with Norteño and Untouchable graffiti, with weapons, ammunition, marijuana and sales paraphernalia. As to Manzo, there was evidence that he was convicted, several years previously, of possession of marijuana for sale and sale of marijuana, that he associated with gang members, in violation of his probation, in an area where a shooting had just occurred, that he was seen in a gang area with other gang members, wearing the Norteño color red, that he wore a red memorial t-shirt for a slain gang member with "East 15th" on the back, that it would be unusual for someone not affiliated with a gang to wear such a shirt, that his room contained gang-related clothing and shoes, and that in 2009 he attended the funeral of a slain Norteño gang member. We recognize that many of these events had taken place some years before the court issued the preliminary injunction. However, as to both Quintero and Manzo, we conclude the evidence is sufficient to support the trial court's conclusion that they were active members of the Norteño criminal street gang.

## G. Additional Issues

Defendants raise three additional issues. First and second, they contend the trial court erred in entering, or refusing to vacate, defaults against (1) the Norteños and (2) individual defendants Acosta and Martinez. Their discussions of these points lack reasoned argument, citations to authority, and adequate record citations, and we deem them waived. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785; *Berger v. Godden* (1985) 163 Cal.App.3d 1113, 1119; *Nwosu*, *supra*, 122 Cal.App.4th at p. 1246.)

20

Third, defendants argue the trial court erred in denying their request for appointed counsel, which they made on the ground that the individual defendants faced a substantial deprivation of liberty as a result of the proceedings. The trial court denied the motion on two procedural grounds: that the motion was improperly brought by two attorneys who purported to "Specially Appear" for defendants, as "[t]here is no authority for the use of the device of 'special appearance' in this manner," and that because defendants were in default at the time of their motion, the only form of relief they could seek was relief from default. The court also denied the motion on the merits, citing *Iraheta v. Superior Court* (1999) 70 Cal.App.4th 1500, which held that due process did not give alleged street gang members a right to appointed counsel in an action for a gang injunction. In their briefs, defendants neither cite nor distinguish *Iraheta*; more important, they entirely ignore the two procedural grounds that provided independent bases for the trial court's order denying their request for appointed counsel. It is the appellants' burden to show the trial court has committed reversible error, and they have failed to do so here. (*State Farm Fire & Casualty Co. v. Pietak* (2001) 90 Cal.App.4th 600, 610.)

### III. DISPOSITION

The orders appealed from are affirmed.

_____
Rivera, J.

We concur:

_____
Reardon, Acting P.J.

_____
Humes, J.

21