Filed 4/29/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CHRISTIAN NOEL PADILLA-MARTEL,<br><br>    Defendant and Respondent. | A162872<br><br>(San Francisco County<br>Super. Ct. No. CGC-20-586763) |
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>VICTOR ZELAYA,<br><br>    Defendant and Respondent. | A162873<br><br>(San Francisco County<br>Super. Ct. No. CGC-20-586761) |
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>JAROLD SANCHEZ,<br><br>    Defendant and Respondent. | A162874<br><br>(San Francisco County<br>Super. Ct. No. CGC-20-586753) |
| THE PEOPLE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>GUADALOUPE AGUILAR–BENEGAS,<br><br>    Defendant and Respondent. | A162875<br><br>(San Francisco County<br>Super. Ct. No. CGC-20-586732) |

In these civil actions, the People, by the San Francisco City Attorney (City) allege defendants Christian Noel Padilla-Martel, Victor Zelaya, Jarold Sanchez, and Guadaloupe Aguilar-Benegas are street-level drug dealers whose drug-dealing activities in the Tenderloin neighborhood create a public nuisance (Civ. Code, §§ 3479, 3480) and violate the unfair competition law (Bus. & Prof. Code, § 17200 et seq.) (UCL).

Before a trial on the merits of its claims, the City moved for preliminary injunctions against defendants that would prohibit them from entering a 50-block exclusion zone in the heart of San Francisco. There was no dispute about the conditions in the Tenderloin. Defendants acknowledged the area is "facing a drug-related health crisis," and the trial court found the City established the neighborhood is "rife with illegal drug-dealing" and related activities. Nor was there any dispute that the City has authority to seek injunctive relief to address public nuisances and UCL violations; defendants and the trial court agreed, for example, that the City could enjoin individuals from engaging in illegal drug selling in the Tenderloin.

But the trial court denied the City's motions for preliminary injunctions on two independent grounds, both based on the scope of the proposed injunctions. First, the trial court determined that a stay-away order—as opposed to an injunction prohibiting certain conduct—is not an authorized remedy under either the public nuisance law or the UCL. Second, even assuming stay-away orders are available statutory remedies, the trial court concluded the specific injunctive relief the City requested would be constitutionally impermissible under the facts of these cases. The court determined that excluding defendants from such a large area in the center of San Francisco implicates the constitutional right to intrastate travel—that is, the right to travel locally through public spaces and roads—and the City

2

failed to meet its evidentiary burden of convincing the court that its proposed remedy was sufficiently tailored to minimally infringe upon the protected interests at stake.

The City appeals, challenging both grounds for denying its motions. Unlike the trial court, we are not prepared to hold that a stay-away order could *never* be a potential remedy for a public nuisance or unfair business practice in an appropriate case. However, the City has failed to show error in the trial court's finding that the proposed stay-away orders are insufficiently tailored to pass constitutional muster based on the evidentiary record before it. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*The City's Complaints*

In September 2020, the City filed similar civil complaints against each defendant, and against 24 other individuals whose cases are not before us, asserting public nuisance and UCL claims. In each complaint, the City sought a permanent injunction ordering the defendant "to stay away from the proposed Tenderloin Drug Abatement Area and any area of the City and County of San Francisco where DEFENDANT has engaged in the illegal sale of controlled substances." The "proposed Tenderloin Drug Abatement Area" (abatement area) comprises about 50 square blocks and covers over 221 acres.[1] The City sought liability of up to $6,000 for each violation of the injunction and civil penalties of up to $2,500 for each violation of the UCL, plus fees and costs.

---

[1] The borders of the abatement area are Ninth Street from Mission Street to Market Street, north on Larkin Street to Turk Street, west on Turk to Van Ness Avenue, north to Geary Street, east to Powell Street, south to Market, southwest to Fifth Street, south on Fifth to Mission, and Mission to Ninth.

*Motions for Preliminary Injunctions*

In March 2021, the City filed a motion for preliminary injunction against each of the four defendants.[2] The City asked the court to issue stay-away orders prohibiting defendants from entering the abatement area with limited exceptions for (1) riding public transit (but not getting on or off) either by bus along the western boundary of the abatement area or by train running underground through the Tenderloin, (2) using one side of the sidewalk on one street for half a block if necessary to go to scheduled federal court appearances, and (3) making "a scheduled visit to a particular location" in the abatement area "to conduct specified lawful business on a designated date and time," but "only with the PEOPLE's advance written and filed stipulation" and with the requirement that the defendant carry a copy of the stipulation.[3] A violation of the proposed injunction would subject a defendant to criminal proceedings under Penal Code section 166.

---

[2] The City states in its opening brief that these four defendants' cases are the first to reach the preliminary injunction stage, and this is the reason the other 24 defendants are not parties to these consolidated appeals. Defendants respond it is more accurate to say these are the only cases being litigated; they assert the City has failed to serve most of the other named defendants and one defendant has died.

[3] The exceptions provided in the proposed injunctions were:

"a. DEFENDANT is allowed to travel underground through the Tenderloin Drug Abatement Area on BART and Muni Metro. DEFENDANT, however, may not board or leave the trains at Civic Center Station or Powell Street Station.

"b. DEFENDANT is allowed to travel on public transit buses along Van Ness Avenue. DEFENDANT may not board or leave the bus within the Tenderloin Drug Abatement Area.

"c. If DEFENDANT has a scheduled federal court appearance at 450 Golden Gate Avenue and the Golden Gate entrance is not available to

The City supported its motions with declarations from San Francisco police officers and members of the community that described drug dealing, drug use, and associated crime and disruptive activities in the Tenderloin neighborhood.

The City submitted a declaration from San Francisco Police Captain Carl Fabbri, who as of the date of his declaration in March 2021, was the commanding officer of the Tenderloin police district, which is one of 10 police districts in San Francisco.[4]  According to Fabbri, "the overall crime rates in the Tenderloin are historically about three times higher than in the City overall on a per capita basis," it "is the epicenter of illegal drug sales in the City," and "the situation [in the neighborhood] has worsened in recent years and months."  In 2020, there were 600 arrests for drug dealing in the Tenderloin, and officers seized over \$288,000 in cash and more than 18 kilograms of heroin, cocaine, methamphetamine, and fentanyl.  In addition, drug overdoses have increased in recent years.  There were 699 drug overdose deaths in San Francisco in 2020,[5] up from 441 overdose deaths in 2019 and 259 in 2018.

---

DEFENDANT, DEFENDANT is allowed to use the sidewalk on the south side of Turk Street from Polk Street to the Turk Street entrance.

"d. DEFENDANT may, only with the PEOPLE's advance written and filed stipulation, make a scheduled visit to a particular location in the Tenderloin Drug Abatement Area to conduct specified lawful business on a designated date and time. DEFENDANT must carry a copy of said stipulation."

[4] The City's proposed abatement area encompasses most of the Tenderloin police district plus a few streets in the Northern police district.

[5] In a declaration from February 2021, the Chief Forensic Toxicologist of the City's Office of the Chief Medical Examiner reported that 154 of the 699 overdose deaths occurred in the Tenderloin.

Fabbri reported that approximately 125 full-time police officers were assigned to Tenderloin Station but the Tenderloin neighborhood remains the "primary place to buy or sell drugs in San Francisco and throughout the Bay Area." According to Fabbri, most drug dealers do not live in the Tenderloin. He stated that drug users are also a problem, as they commit theft crimes in the Tenderloin to buy drugs and, when using drugs, they often exhibit erratic behavior.

Fabbri opined that a civil "injunction preventing drug dealers from coming to the Tenderloin would be a useful tool to combat street drug dealing and the negative effects on the Tenderloin, beyond the tools of existing criminal laws" because "enforcing a stay-away order requires far less police resources than doing a drug bust." He believed the size and borders of the proposed abatement area were "appropriate and necessary" because "sellers are mobile, and are not confined to a particular street corner."

Officer declarations described each defendant's arrests in San Francisco for drug-related charges and for violating stay-away orders. The declarations, however, did not show that any of the defendants has been *convicted* of selling drugs, possessing drugs for sale, or violating any pre-trial stay-away orders. Padilla-Martel was arrested three times within three months in 2020.[6] Zelaya was arrested three times from July 2019 to May

---

[6] On May 2, 2020, Padilla-Martell was found on the 300 block of Golden Gate Avenue with suspected fentanyl, cocaine salt, heroin, and $446 in cash, and he admitted to police that he was conducting drug sales. On June 29, he was observed on Hyde Street between Golden Gate Avenue and McAllister Street engaging in hand-to-hand drug sales. He was arrested for violating a court order to stay 150 yards away from 300 Golden Gate Avenue, and he was found with suspected fentanyl and methamphetamine, as well as $201 in crumpled bills. On July 20, he was seen on Hyde Street near Golden Gate Avenue engaging in hand-to-hand drug sales. On that occasion, Padilla-

2020.[7]  Sanchez was arrested five times between February 2020 and February 2021.[8]  Aguilar-Benegas was arrested on five different occasions between May 2020 and February 2021.[9]

All four defendants were Oakland residents at the time of their arrests. None of defendants' arrests involved violence, and to the extent defendants were arrested in the Tenderloin, each defendant's arrests occurred within a small portion of the proposed abatement area.[10]

*Defendants' Oppositions*

Defendants opposed the motions for preliminary injunctions, arguing the City did not show a likelihood of success on the merits at trial.  (Whether the City ultimately will prevail on its public nuisance and UCL claims at trial is not an issue on appeal, but defendants dispute the merits of the City's

---

Martel had over $1,000 and suspected fentanyl, cocaine base, and heroin, and he was again in violation of a stay-away order.

[7] On May 20, 2020, Zelaya was observed at Seventh and Market Streets engaged in hand-to-hand drug sales and was found with suspected fentanyl, cocaine base, heroin, and methamphetamine.  He was in violation of several stay-away orders from criminal cases.  One court order required Zelaya to stay away from the area bounded by Mission Street, O'Farrell Street, Van Ness Avenue, and Powell Street.  Another ordered him to stay 150 yards from the area bounded by Franklin, Geary, and Market Streets.

[8] Three times, Sanchez was arrested around the 300 block of Golden Gate Avenue.  The drugs found in his possession included suspected methamphetamine, cocaine salt, cocaine base, heroin, and fentanyl.

[9] On each occasion, Aguilar-Benegas was found with large amounts of cash and multiple illegal drugs, including suspected cocaine base, heroin, methamphetamine, cocaine salt, and fentanyl.  She was arrested twice at 240 Hyde Street and once at 308 Turk Street.  Several times, Aguilar-Benegas was also in violation of stay-away orders issued by the criminal court.

[10] Zelaya was arrested three times, but only one arrest occurred within the abatement area.

7

claims.)  Defendants also argued the City could not establish the balance of interim harms tipped in its favor and, in any event, the proposed injunctive relief was improper and overbroad.  They asserted the City was using defendants as "scapegoat[s] in its ill-conceived effort to make a political point" and the proposed injunctions would harm defendants "and the community while doing nothing to increase public safety or reduce substance abuse."

Defendants submitted declarations from attorneys, social and health services providers in the Tenderloin, and professors with expertise in policing and drug laws, all of whom supported the view that the proposed injunctions would not address the serious problems facing the Tenderloin, which include poverty, housing insecurity, mental and physical health issues, drug use disorder, and food insecurity.

For example, the director of harm reduction services at the Glide Foundation, located in the Tenderloin neighborhood, stated that in her experience, "arresting individuals selling drugs on the streets of the Tenderloin has no impact on the availability of drugs for sale" as "other people simply fill in any gap."  She opined, "Spending money on these lawsuits and seeking to ban people from the Tenderloin is a waste of resources and will do nothing to reduce the availability and use of drugs in the neighborhood."  Two sociology professors who have published extensively on policing and punishment, Katherine Beckett and Steve Herbert of the University of Washington, stated that the use of "spatial exclusion, or banishment" (including injunctions, curfews, and stay-away orders) significantly erodes the citizenship status of those subject to exclusion and is "futile and counterproductive."

The clinical director of Legal Services for Children described "the various resources, community-based organizations, and governmental agencies" that are located within the proposed abatement area, which provide "vital services" including "substance abuse treatment, emergency shelter and housing, access to public benefits, education restoration, employment readiness and extracurricular programing for youth." He believed that crime and community safety would "remain unchanged by [the proposed] injunctions."

Defendants also submitted their own declarations. Zelaya stated he was 27 years old. He lives with his wife and daughter and runs a food cart business with his wife and sister-in-law. He has two other daughters from a previous relationship who live in the Tenderloin with their grandmother. Zelaya stated he would like to visit his daughters in the Tenderloin and take them to school, to soccer matches, and to get food in the neighborhood, and he would like to be able to take them to the doctor, respond whenever they call, and be able to stay overnight at their apartment. In addition, he is aware of and would like to be able to access various services available in the Tenderloin, such as nonprofits and community organizations that assist with employment, treatment, health, and harm reduction services. Zelaya stated that barring him from the proposed abatement area "would seriously impact [his] everyday life" and he would have to find a way to be with his family without being able to meet his daughters in the Tenderloin when they call him.

Padilla-Martel stated he works painting houses and he would like to find work as a mechanic, which he has trained to do. He has a five-year-old son who lives with his grandparents, and he sends his family money every month. He has taken public transportation in San Francisco using routes

9

that go through the Tenderloin in the past, and he plans to do so in the future.

Sanchez stated he was 23 years old. He lives with his wife, their young son, and his brother-in-law, and his wife was pregnant. He stated he is looking for work and he takes public transportation regularly, including public transportation that passes through the Tenderloin. He understands that there are nonprofits and community organizations in the Tenderloin that assist with employment, housing, and health services, and he would like to access those services.

Aguilar-Benegas stated she was 28 years old, she had two young children, and she was pregnant and expecting her third child in a few weeks. Her husband had died unexpectedly in 2020. She was contacted about scheduling an ultrasound appointment at a clinic she believed was in the Tenderloin. She understands there are nonprofits and community organizations in the Tenderloin and she would like to access those services, including help finding work and affordable housing.

*Trial Court Ruling*

The trial court heard argument on the City's motions for preliminary injunctions and subsequently issued a comprehensive 23-page order denying the motions.

The trial court found the City's "extensive and largely undisputed" evidence showed the Tenderloin is "rife with illegal drug-dealing and other associated activities." The court found that "blatant and open-air drug sales have been increasingly common in the Tenderloin, with drug dealing occurring all day and night; that sales of narcotics take place" near children; "that neighborhood residents and workers have to move to the other side of the street or into the street to avoid drug dealers; that injection and other

10

open drug use is common on public streets, [and] sidewalks"; that users leave behind "crack pipes and dirty syringes, as well as human waste; and that rampant drug dealing in the Tenderloin is directly and indirectly related to numerous other crimes committed by drug dealers and their customers, including theft, weapons trafficking, and violent crimes."[11] The court also found substantial evidence that each defendant engaged in illegal sales of, or possessed for sale, controlled substances in the Tenderloin on multiple occasions and violated stay-away orders issued by the criminal courts.[12]

Based on these findings, the court determined the City showed a likelihood of prevailing on the merits of its claims. As to the public nuisance claim, the court reasoned, "illegal drug-dealing in the Tenderloin . . . constitutes a public nuisance that affects the entire Tenderloin neighborhood, or at the very least a considerable number of persons who reside or work in that neighborhood," and defendants' illegal activity "contributed to the overall public nuisance." As to the UCL claim, it found "[t]he UCL extends to the illegal sale of drugs," including the individual defendants' "ongoing unlawful conduct."

Nonetheless, the trial court denied the City's motions after determining the injunctive relief the City asked for was both statutorily and constitutionally impermissible. At the outset, the court concluded that neither the public nuisance law nor the UCL authorizes the "creation of an

---

[11] We grant the City's request that we take judicial notice of the Mayor of San Francisco's declaration on December 17, 2021, of a 90-day local emergency related to drug overdoses in the Tenderloin.

[12] We note that, from our review of the record, it appears Zelaya was arrested only once within the abatement area and was arrested just outside the area on two occasions. This does not change our analysis or disposition, however.

11

exclusion zone" as a potential remedy. Distinguishing a person's conduct (which may create a nuisance or constitute an unlawful business practice) from a person's presence in a geographic location, the court inferred that the public nuisance law does not authorize the City's proposed injunctions because "abatement is equivalent to an injunction against injurious *activity* or *conduct*—not removal of a person who has engaged in such conduct." Similarly, the court reasoned, "the purpose of injunctive relief under the UCL is to prohibit unfair competitive *practices* or conduct—not to exclude the persons engaged in it."

The court further found that, even assuming stay-away orders are authorized by statute, the specific injunctive relief sought by the City in these cases would violate defendants' constitutional rights because it was not sufficiently tailored to minimally infringe upon defendants' constitutional rights to intrastate travel. The court reasoned, "By no stretch of the imagination is [the City's proposed injunctive relief] narrowly tailored. Rather than prohibit specified harmful conduct, it prohibits mere presence in the exclusion zone, at any time of the day or night and for any reason. It would preclude defendants from entering the area for any purpose, including accessing vital social and health services."

## DISCUSSION

A.  *Standard of Review*

Generally, "the question whether a preliminary injunction should be granted involves two interrelated factors: (1) the likelihood that the plaintiff will prevail on the merits, and (2) the relative balance of harms that is likely to result from the granting or denial of interim injunctive relief." (*White v. Davis* (2003) 30 Cal.4th 528, 554.)

12

On appeal, we accept the trial court's factual findings if they are supported by substantial evidence. We review its decision whether to issue a preliminary injunction for abuse of discretion. We review questions of law de novo. (*People ex rel. Feuer v. FXS Management, Inc.* (2016) 2 Cal.App.5th 1154, 1159.)

B.     *Statutory Authority and Scope of Injunctive Relief*

A "nuisance" is defined by statute to include "[a]nything which is injurious to health, including, but not limited to, the illegal sale of controlled substances." (Civ. Code, § 3479.) A "public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." (*Id.*, § 3480.) Civil Code section 3491 provides that the "remedies against a public nuisance" include "[a]batement." " ' "An abatement of a nuisance is accomplished in a court of equity by means of an injunction proper and suitable to the facts of each case." ' " (*People ex rel. Busch v. Projection Room Theater* (1976) 17 Cal.3d 42, 57 (*Projection Room Theater*), italics omitted.)

"[U]nfair competition" includes "any unlawful . . . business act or practice." (Bus. & Prof. Code, § 17200.) The UCL covers " 'anything that can properly be called a business practice and that at the same time is forbidden by law' " (*Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94, 113) and provides, "[a]ny person who engages . . . in unfair competition may be enjoined in any court of competent jurisdiction" (Bus. & Prof. Code, § 17203). Thus, an injunction to abate unlawful activity is an appropriate remedy under both the public nuisance law and the UCL.

The *scope* of injunctive relief available to address a public nuisance or unlawful business practice is limited, however. "It is a familiar doctrine of

13

equity that the scope of [an] injunction will be limited to the wrongful act sought to be prevented." (*Magill Bros. v. Building Service etc. Union* (1942) 20 Cal.2d 506, 512.) Our high court has cautioned, "Injunctive process ought never to go beyond the necessities of the case." (*Anderson v. Souza* (1952) 38 Cal.2d 825, 840–841 (*Anderson*).) "In fashioning a remedy, a court should 'strive for the least disruptive remedy adequate to its legitimate task' and tailor it to the harm at issue." (*People v. Uber Technologies, Inc.* (2020) 56 Cal.App.5th 266, 313 (*Uber*).)

When a nuisance or unlawful business practice occurs in the operation of a legitimate business, any injunction to address the problem must be narrowly drawn to eliminate the unlawful activity and should not restrict on lawful business activity unless absolutely necessary.[13]

Similarly, when an *individual* creates a nuisance or engages in an unlawful business practice, an injunction against the individual must be limited to addressing the unlawful activity. Perhaps the most closely analogous cases to the City's current action are gang injunctions. In *People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090 (*Acuna*), the City of San Jose brought a public nuisance claim against individual alleged criminal street

---

[13] In *Anderson*, neighbors brought a nuisance claim based on the operation of an airport. Our Supreme Court explained, "where a legitimate business is being conducted and in the conduct thereof a nuisance has been created and is being maintained, the [injunctive] relief granted should be directed and *confined to the elimination of the nuisance*, unless under the peculiar circumstances of the case the business, lawful in itself, cannot be conducted without creating a nuisance and violating the rights of contiguous property owners." (*Anderson, supra*, 38 Cal.2d at p. 841, italics added.) *Uber* involved a UCL claim, and the Court of Appeal stated, "an injunction against legitimate business activities *'should go no further than is absolutely necessary* to protect the lawful rights of the parties seeking such injunction.' " (*Uber, supra*, 56 Cal.App.5th at p. 313, italics added.)

gang members. The lower court entered a preliminary injunction prohibiting the defendants from engaging in certain activities in a four-block neighborhood, and the defendants challenged some of the restrictions. (*Id*. at p. 1100.) The California Supreme Court explained that, in "considering the *limitations on the scope*" of the preliminary junction, its first task was to decide, "whether the *activity enjoined* . . . reasonably *falls within* the statutory definition of a *public nuisance . . . .*" (*Id*. at p. 1120, italics added.) In other words, the scope of an injunction against an individual generally should be limited to enjoining his or her unlawful activity.

It is possible to enjoin an individual's lawful activity that is not in itself a nuisance or unlawful business practice, but this is *extraordinary* relief. In another gang injunction case, the defendant was enjoined from engaging in "particular gang-related activity in the target area," including "a host of noncriminal, usually innocuous and wholly ordinary activities, e.g., drinking alcoholic beverages, possessing a glass bottle or a baseball bat or a marker pen or a screwdriver or wire cutters." (*People v. Englebrecht* (2001) 88 Cal.App.4th 1236, 1256.) The Court of Appeal observed, "While it may be lawful to restrict such activity, it is also extraordinary. The government, in any guise, should not undertake such restrictions without good reason and without firmly establishing the facts making such restrictions necessary." (*Ibid*.)

Any injunctive relief in these cases, therefore, must be tailored to addressing the public nuisance or unlawful business practice the trial court finds defendants have engaged in and should not restrict defendants' lawful activities unless the City firmly establishes facts showing that the proposed restrictions are necessary to prevent the unlawful conduct at issue.

C.    *Availability of Stay-Away Orders Under the Statutes*

Here, the trial court recognized injunctive relief is available under the public nuisance law and the UCL and, for example, "[t]here is no question that a court may enjoin the illegal sale of drugs."  But the court correctly observed the particular injunctive relief the City requested is unprecedented under California law.  The parties have not cited, and we have not found, any case in California upholding the use of a neighborhood-wide exclusion zone as injunctive relief to abate a public nuisance or address an unfair business practice.

As we have described, the trial court went on to decide that the broad stay-away orders the City seeks are not simply unprecedented, they are *not permitted* under the statutes.  The City contends the court erred in concluding that stay-away orders are not potential equitable remedies under either the public nuisance or UCL statutes.  The City relies on the principle that courts generally have broad power to abate nuisances and fashion relief under the UCL, although the examples the City relies on are not particularly apt.

Discussing nuisances, the City cites cases in which structures were ordered to be demolished and removed because the structures themselves constituted nuisances (e.g., *Golden Gate Water Ski Club v. County of Contra Costa* (2008) 165 Cal.App.4th 249, 253–254, 266; *People v. Wheeler* (1973) 30 Cal.App.3d 282, 285, 292, 299) and Civil Code section 3495, which provides, "Any person may abate a public nuisance which is specially injurious to him by removing, or, if necessary, destroying the thing which constitutes the same, without committing a breach of the peace, or doing unnecessary injury."  The City also cites statutes that authorize the closure of buildings or

16

places that constitute particular types of nuisances.[14] (See Pen. Code, § 11230, subd. (a); Health and Saf. Code, § 11573.5.) Although the City concedes that these statutes do not apply in the cases now before us, it asserts they are "illustrative of the expansive powers granted courts to address and abate nuisances." The City suggests, "If courts are authorized to raze entire buildings to abate a nuisance, surely, they can prohibit individuals from coming to a location to engage in illegal activity." We find this argument less than persuasive. It goes without saying that human beings do not constitute nuisances in themselves and that things do not have the same rights as individuals. That a "thing" (Civ. Code, § 3495) constituting a nuisance can be removed and destroyed or a nuisance building can be shut down sheds no light on the limits of a court's power to curtail a person's freedom of movement generally when that person has been found to have created a public nuisance by their unlawful conduct.

Discussing the UCL, the City quotes *Hewlett v. Squaw Valley Ski Corp.* (1997) 54 Cal.App.4th 499, 540 (*Hewlett*), which described the remedial power of Business and Professions Code section 17203 as " 'extraordinarily broad' " and observed, "Injunctive relief 'may be as wide and diversified as the means employed in perpetration of the wrongdoing.' " But nothing about the facts of that case suggests that a neighborhood-wide stay-away order against an

---

[14] The City cites laws that define as nuisances any building or place used for illegal gambling, lewdness, or prostitution (Pen. Code, § 11225) and any building or place used for unlawfully selling storing or manufacturing any controlled substance is a nuisance (Health and Saf. Code, § 11570). Under these laws, the building or place may be closed to abate the nuisance. (Pen. Code, § 11230, subd. (a); Health and Saf. Code, § 11573.5.) These statutes are not at issue in this case and do not form the basis for the relief the City seeks.

individual would be an available remedy for unfair business practices.[15]  The

City describes *People ex rel. City of Santa Monica v. Gabriel* (2010) 186

Cal.App.4th 882 (*Gabriel*) as demonstrating that a UCL injunction may

exclude "the violator from the scene of their earlier violations and victims."

There, the City of Santa Monica filed a UCL action against a landlord

alleging the landlord sexually harassed a tenant, entered tenants' units

without permission, and rented uninhabitable space as living quarters." (*Id*.

at p. 884.)  The trial court found the allegations true and ordered the

defendant " 'to have no contact with any past, present or future tenants,' "

and " 'not to enter any rental unit, either occupied or vacant, unless

accompanied by a member of the management company and with good

cause.' " (*Id*. at p. 886.)  The defendant did not challenge this order on

appeal,[16] and it is well established that "a case is authority only for a

proposition actually considered and decided therein." (*In re Chavez* (2003) 30

Cal.4th 643, 656.)  However even considering the injunctive relief in *Gabriel*

as an example of a UCL remedy, it shows at most that a no-contact order to

---

[15] In *Hewlett*, the Placer County District Attorney alleged a ski resort engaged in unlawful business practices by cutting down trees in violation of the Forest Practice Act. (*Hewlett, supra*, 54 Cal.App.4th at p. 509.)  The trial court found the resort violated the Forest Practice Act and enjoined the resort from any tree cutting and prohibited further development. (*Id*. at pp. 509–510, 517.)  On appeal, the resort challenged the injunctive relief ordered, and it was in this context that the appellate court made its observations about the breadth of trial court remedial powers under the UCL.  But the injunction at issue enjoined the resort's unlawful conduct of cutting trees.  It did not prohibit alleged wrongdoers from entering their own property.

[16] Instead, the landlord unsuccessfully argued sexual harassment of a tenant is not a business practice and successfully challenged an award of attorney's fees as unauthorized under the UCL. (*Gabriel, supra*, 186 Cal.App.4th at pp. 887, 889.)

protect individual victims may be an available remedy in the appropriate case, not that an order to stay away from an area is authorized. The *Gabriel* defendant was not prohibited altogether from going to the area where the rental property was located. He was only prohibited from entering a rental unit without a manager present and without good cause after the court found that he committed UCL violations by entering tenants' units without permission in the past.

Still, the fact that a remedy has not been ordered before does not mean it is not allowed. While it is true that the City has not definitively established that stay-away orders are statutorily authorized, defendants have not convinced us stay-away orders are necessarily prohibited either. Thus, we cannot affirm the trial court's order on the ground the public nuisance and UCL statutes *categorically* prohibit stay-away orders.

D.     *Constitutional Considerations*

Next, we consider the trial court's alternative basis for denying the City's motions—that the proposed injunctions would violate defendants' constitutional rights because they are not narrowly tailored to the circumstances of these cases.

Any injunctive relief must, of course, comply with our state and federal constitutions. (See *Projection Room Theater*, *supra*, 17 Cal.3d at p. 55 ["the California public nuisance statutes must be enforced in such a way as to operate in a constitutional fashion"].) Here, the trial court determined that, even if the remedy were authorized by the public nuisance or UCL statutes, the City's proposed injunctive relief would violate defendants' constitutional right to intrastate travel.

"The right of intrastate travel has been recognized as a basic human right protected by article I, sections 7 and 24 of the California Constitution."

19

(*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1100, citing *In re White* (1979) 97 Cal.App.3d 141.) And the United States Supreme Court has observed, "[T]he freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment. We have expressly identified this 'right to remove from one place to another according to inclination' as 'an attribute of personal liberty' protected by the Constitution." (*City of Chicago v. Morales* (1999) 527 U.S. 41, 53.) The right to intrastate travel is based on its necessity for daily life. It has been said, "The right to travel locally through public spaces and roadways—perhaps more than any other right secured by substantive due process—is an everyday right, a right we depend on to carry out our daily life activities. It is, at its core, a right of function." (*Johnson v. City of Cincinnati* (6th Cir. 2002) 310 F.3d 484, 498 (*Johnson*).)[17]

As a preliminary matter, the City suggests the trial court applied the incorrect level of scrutiny in evaluating the constitutionality of the proposed injunction. The City argues the correct standard for assessing the

---

[17] Although the United States Supreme Court has not explicitly recognized a federal constitutional right to intrastate travel, the federal right was recognized by the Sixth Circuit Court of Appeals in *Johnson*. (310 F.3d at pp. 487–488, 498, 502–505 [concluding an ordinance banning individuals arrested for drug offenses from "drug exclusion zones" violated the right to intrastate travel of plaintiffs subject to the ordinance]; see also *Ramos v. Town of Vernon* (2d Cir. 2003) 353 F.3d 171, 176 ["The right to intrastate travel, or what we sometimes will refer to as the right to free movement, has been recognized in this Circuit"]; *Lutz v. City of York* (3d Cir. 1990) 899 F.2d 255, 267 [recognizing the Due Process Clause protects the right to intrastate travel]; but see *McGraw v. City of Oklahoma City* (10th Cir. 2020) 973 F.3d 1057, 1081 [while acknowledging that several "circuits have explicitly held that a fundamental right to the freedom of movement exists" the Tenth Circuit Court of Appeals has "concluded that the fundamental right to freedom of movement 'appl[ies] only to *interstate* travel' "].)

20

constitutionality of the proposed injunctions is the standard used in probation condition cases such as *People v. Smith* (2007) 152 Cal.App.4th 1245. In *Smith*, the court held, "Probation conditions restricting a probationer's exercise of his constitutional rights are upheld only if narrowly drawn to serve the important interests of public safety and rehabilitation, *and* if they are 'specifically tailored to the individual probationer.' " (*Id.* at p. 1250.)

Defendants contend that the correct level of scrutiny is strict scrutiny (i.e., "narrowly tailored to promote a compelling governmental interest") because the proposed injunctions impinge on defendants' fundamental right to travel. (*Nunez by Nunez v. City of San Diego* (9th Cir. 1997) 114 F.3d 935, 944, 946 [applying strict scrutiny review to a curfew ordinance challenged on the ground it infringed on "fundamental rights" of "the right of free movement and the right to travel"]; see *Thompson v. Mellon* (1973) 9 Cal.3d 96, 102 [applying strict scrutiny test to durational residence requirements for candidacy for public office because "such restrictions on the right to be a candidate impinge on . . . fundamental rights, [including] . . . the right to travel"].)

We need not decide this question, however, because the trial court applied the standard the City advocates and still determined the proposed injunctions would impermissibly infringe the constitutional right to travel. The trial court wrote, " '[a] *probation condition* that imposes limitations on a person's constitutional rights must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad.' " (*In re Sheena K.* (2007) 40 Cal.4th 875, 890.) The broad relief the People seek here—a preliminary injunction prohibiting defendants from entering an entire neighborhood of San Francisco—sweeps far more broadly

21

than the stay-away order from a single chain of stores involved in [*People v.*] *Moran*.[18]  By no stretch of the imagination is it narrowly tailored." (Italics added.)  Thus, the court found, even under the more lenient standard used for probation conditions imposed on individuals who have been convicted of crimes, the City's proposed injunctions would violate defendants' constitutional right to intrastate travel.

The City next asserts that the trial court erred by "fail[ing] to consider the 'fit' between the proposed restriction, [defendants]' misconduct, and the nuisance conditions in the Tenderloin community."  We see no basis for this assertion.  The trial court explicitly found the injunctive relief sought by the City was "[b]y no stretch of the imagination . . . narrowly tailored," because,

---

[18] The City had cited *People v. Moran* (2016) 1 Cal.5th 398, for the proposition that a stay-away order's "incidental effect of precluding a defendant from traveling within the stay-away area" would not violate a constitutional right to travel.  In *Moran*, the defendant stole items from a Home Depot store and, in a plea deal, agreed to the probation condition that he not enter any Home Depot store or adjacent parking lot in the state of California.  (*Id*. at p. 401.)  Addressing the defendant's subsequent challenge to the probation condition as violating his right to travel, the California Supreme Court concluded, "The effort fails, as the condition *simply does not implicate his constitutional travel right.  Indeed, one struggles to perceive how the condition curtails his right to free movement in any meaningful way.  Although defendant argues he is prohibited 'from entering large areas of the state' and from 'shopping or working in any store that shares a parking lot with a Home Depot,' that surely is an exaggeration. He remains free to drive on any public freeway, street or road, use public transportation, work (except in Home Depot stores), shop, visit the doctor's office, attend school, enjoy parks, libraries, museums, restaurants, bars, clubs, and movie theaters. He may—without violating the challenged condition—freely move about his community, the city, and the State of California.  In short, the restriction on [the defendant's] movement imposed by the probation condition is too de minimis to implicate the constitutional travel right." (*Id*. at p. 407, italics added.)

"[r]ather than prohibit specified harmful conduct, it prohibits mere presence in the exclusion zone, at any time of the day or night and for any reason . . ., including accessing vital social and health services." In this way, the trial court found, based on the evidence before it, that the proposed 50-block stay-away orders were not necessary to address the harm caused by defendants. The record showed that each defendant was arrested in a small area within the proposed abatement area, and the trial court reasonably could have determined that the exclusion zone was unnecessarily large or its borders unnecessarily kept these defendants from accessing public transit and health and social services. Although the City contends these defendants have no reason to ever even be in the 50-square-block Tenderloin neighborhood except to sell drugs there was evidence that many community resources and government agencies are located in the Tenderloin, and the trial court certainly was not required to discredit defendants' statements that they were interested in taking advantage of the employment, treatment, housing, and health services available in the 50-square-block neighborhood.[19]

We have rejected the City's legal claims that the trial court applied the incorrect level of scrutiny and that it failed to consider the "fit" between the proposed restrictions and harm at issue. What remains is the trial court's determination, based on the evidence presented, that the City's proposed injunctions are not sufficiently narrowly tailored to address the harm at issue to pass constitutional muster. Although the City continues to argue that the proposed injunctions *are* narrowly drawn, to establish reversible error, the

---

[19] Moreover, the " 'right to remove from one place to another according to inclination' [i]s 'an attribute of personal liberty' protected by the Constitution" (*City of Chicago v. Morales*, *supra*, 527 U.S. at p. 53), and it is not normally an individual's burden to show she has a reason or purpose for traveling from place to place.

City must show the trial court's contrary factual findings are unsupported by substantial evidence. (*People ex rel. Feuer v. FXS Management, Inc., supra,* 2 Cal.App.5th at p. 1159.) That it has simply failed to do. We defer to the trial court's factual findings even when they are applied to constitutional concerns. (See *Acuna, supra,* 14 Cal.4th at pp. 1121–1122 [considering a constitutional challenge to a gang injunction provision, the California Supreme Court "defer[red] to the superior knowledge of the trial judge" on the question whether a lesser restriction would be reasonable.]) Therefore, we will not disturb the trial court's ruling on the City's motions for preliminary injunctions.

We close by observing that we do not minimize the serious and pervasive harm caused by the flood of street-level drug sales in the Tenderloin. We are mindful of, and sympathetic to, the challenges faced by the City in addressing the issues of illegal drug sales, drug use, and the drug-related health crisis and its effects on the people who live and work in the neighborhood. That said, we hold—and it is all we hold—that the City has not shown the trial court erred in denying the City's requested interim relief against these four defendants.

## DISPOSITION

The order denying the motions for preliminary injunctions is affirmed.

_____

Miller, J.


WE CONCUR:


_____

Richman, Acting P.J.


_____

Stewart, J.


A162872, *People v. Padilla-Martel*; A162873, *People v. Zelaya*; A162874, *People v. Sanchez*; A162875, *People v. Aguilar-Benegas*

Court:  San Francisco County Superior Court

Trial Judge:  Hon. Ethan P. Schulman

Dennis J. Herrera and David Chiu, City Attorneys, Peter J. Keith, Chief Attorney, Meredith B. Osborn, Chief Trial Attorney, and Holly D. Coulehan, Deputy City Attorney, for Plaintiff and Appellant.

Swanson & McNamara, Edward Swanson, Carly Bittman; American Civil Liberties Union Foundation of Northern California, Chessie Thacher; DLA Piper, David F. Gross, Robert Nolan, Mandy Chan, Karley Buckley and Katherine Thoreson for Defendants and Respondents.

Tifanei Ressl-Moyer and Lauren Carbajal for Lawyers' Committee for Civil Rights of the San Francisco Bay Area, National Harm Reduction Coalition, Pangea Legal Services, Centro Legal de la Raza and Coalition on Homelessness as Amici Curiae on behalf of Defendants and Respondents.

A162872, *People v. Padilla-Martel*; A162873, *People v. Zelaya*; A162874, *People v. Sanchez*; A162875, *People v. Aguilar-Benegas*